## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| TOWERNORTH DEVELOPMENT, LLC, | |
| Plaintiff, | |
| v. | Case No.: 3:25-cv-964 |
| BAYFIELD COUNTY; and BAYFIELD COUNTY BOARD OF ADJUSTMENT, | |
| Defendants. | |

## COMPLAINT

## WHAT THIS CASE IS ABOUT

1.      This is an action for review under the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7)(B)(v). It is also an action for declaratory judgment under federal and Wisconsin state law.

2.      Plaintiff TowerNorth Development, LLC seeks relief from Bayfield County's and its Board of Adjustment's unlawful delay in processing—and denial of—TowerNorth's application for a conditional use permit to construct a necessary telecommunications tower in Bayfield County.

3.      Defendants' denial violates the federal Telecommunications Act of 1996: it was not supported by substantial evidence and was not issued in a reasonable period of time.

4.      Defendants' delay and denial violate Wisconsin Statutes section 66.0404. The mandatory consequence of that delay is that TowerNorth's application is deemed approved by operation of law.

5.      TowerNorth seeks declaratory and injunctive relief and requests that the Court enter an order either (a) enjoining Defendants from interfering with TowerNorth's "entitle[ment] to proceed with the activity for which it sought approval in its application," *State ex rel. United States Cellular Operating Co. LLC v. Town of Fond du Lac*, 2025 WI App 21, ¶¶ 46–47, 50, 415 Wis. 2d 720, 19 N.W.3d 627; (b) enjoining Defendants to issue all necessary permits to allow TowerNorth to proceed with construction of the proposed tower; or (c) both

## REQUEST FOR EXPEDITED REVIEW

6.    TowerNorth requests expedited review of this action under 47 U.S.C. § 332(c)(7)(B)(v), in which Congress directed that "court[s] shall hear and decide [actions under the Telecommunications Act of 1996] on an expedited basis."

## PARTIES

7.    Plaintiff TowerNorth Development, LLC, is a Delaware limited liability company authorized to do business in the State of Wisconsin, with a business address of 2400 Ansys Drive, Suite 102, Canonsburg, PA 15317.

8.    Defendant Bayfield County is a county existing under the laws of the State of Wisconsin. Its address is 117 E 5th Street, P.O. Box 878, Washburn, WI 54891.

9.    Defendant Bayfield County Board of Adjustment is a part of Bayfield County and is a county board of adjustment existing under the laws of the State of Wisconsin. Its address is 117 E 5th Street, P.O. Box 878, Washburn, WI 54891.

## JURISDICTION AND VENUE

10.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because it concerns federal questions arising under the Telecommunications Act, 47 U.S.C. § 151 et seq., and specifically 47 U.S.C. § 332(c)(7)(B)(v).

11.    This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367 because those claims are part of the same case or controversy as the federal questions before the Court.

12.    This Court has personal jurisdiction over Defendants because they are governmental bodies located in the State of Wisconsin.

3

13.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in Bayfield County, Wisconsin, which is located in this judicial district.

## FACTUAL BACKGROUND

### I.     Background Law

14.     In the Telecommunications Act of 1996, Congress made it national policy to "make available, so far as possible, to all people of the Unites States, without discrimination . . . a rapid, efficient, nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of national defense, [and] for the purpose of promoting safety of life and property through the use of wire and radio communications." 47 U.S.C. § 151.

15.     Bringing this policy to life, federally licensed wireless communications carriers like Verizon Wireless provide wireless communications services to local businesses, public safety entities, and the general public in Wisconsin and throughout the country.

16.     To provide these services, carriers must create and maintain a network of digital "cell sites" each of which consists of antennas and related electronic communications equipment designed to send and receive radio communications signals.

17.     Coverage from cell sites must overlap in a grid pattern resembling a honeycomb. If a wireless communications carrier cannot construct a cell site within a specific geographic area, it will not be able to provide acceptable service to its consumers within that area.

18.     Engineers from the carriers use sophisticated, industry-standard computer programs and extensive field testing to complete a propagation study, which shows where cell sites need to be located in order to provide service. The propagation study also considers the topography of the land, the coverage boundaries of neighboring cell sites and other factors. For a wireless network to perform well, cell sites must be located, constructed and operated so reliable coverage can be achieved. Only when the entire wireless network is operational will a mobile user have reliable service, and uninterrupted and optimal communications throughout a given territory. If there is no functioning cell site within a given area, there will be no mobile wireless service for customers within that area, or in the alternative, mobile customers who travel into that area will experience an unacceptable level of mobile wireless service.

19.     The carriers don't do all this by themselves. They often work with entities like TowerNorth to develop, construct, and manage their necessary telecommunications infrastructure, including, among other things, communications towers (often referred to as "cell towers").

20.     The siting of telecommunications towers is governed by a mix of local, state, and federal law.

21.     Starting at the top, Congress enacted the Telecommunications Act of 1996 "to encourage the rapid deployment of new telecommunications technologies." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005) (quoting Preamble, P.L. 104-104, 100 Stat. 56 (1996)); 47 U.S.C. § 151. To that end, the Act contains various provisions for the "reduction of the impediments imposed by local

governments upon the installation of facilities for wireless communications." *City of Rancho Palos Verdes*, 544 U.S. at 115. *See generally* 47 U.S.C. §§ 253, 332.

22.    Relevant here, the Act sets a deadline for local government action, colloquially known as a "shot clock." A local government must decide an application to construct a tower "within a reasonable period of time," 47 U.S.C. § 337(c)(7)(B)(ii), which FCC rules define as 150 days or fewer, 47 C.F.R. § 1.6003(c)(iv). The federal "shot clock begins to run when an application is first submitted, not when the application is deemed complete," subject to any tolling. FCC, *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 F.C.C. Rcd. 9088, ¶ 141 (2018) (FCC Order), *available at* https://bit.ly/4oVBhf4; *see* 47 C.F.R. § 1.6003(b), (d).

23.    If a local government denies an application to construct a tower, moreover, its decision "shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 337(c)(7)(B)(iii). The local government's decision "must provide reasons" and "articulate a satisfactory explanation for its action" in a written document "issued essentially contemporaneously with the denial." *T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 302, 307 (2015) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)).

24.    Animated by similar policy concerns as Congress, the Wisconsin Legislature also enacted a Mobile Tower Siting Law that limits local control over telecommunications towers. Wis. Stat. § 66.0404; *see Town of Fond du Lac*, 2025 WI App 21,

¶¶ 35–36; *Savich v. Columbia Cnty. Bd. of Adjustment*, 2024 WI App 43, ¶ 43, 413 Wis. 2d 140, 11 N.W.3d 160. "A political subdivision," such as a county, "may regulate the activities described under par. (a)," including the siting and construction of new telecommunications towers, "*only* as provided in [§ 66.0404]." Wis. Stat. § 66.0404(2)(a), (h) (emphasis added).

25.     More stringent than its federal counterpart, Wisconsin's shot clock is shorter in time and includes a defined consequence for untimeliness:

> Within 90 days of its receipt of a complete application,[1] a political subdivision shall complete all of the following . . .
>
> 1. Review the application to determine whether it complies with all applicable aspects of the political subdivision's building code and, subject to the limitations in this section, zoning ordinances.
>
> 2. Make a final decision whether to approve or disapprove the application.
>
> 3. Notify the applicant, in writing, of its final decision.
>
> 4. If the decision is to disapprove the application, include with the written notification substantial evidence which supports the decision.

*Id.* § 66.0404(2)(d). (Unlike the federal shot clock, the state shot clock begins to run only after an application is deemed complete.) If a political subdivision fails to complete all four steps "[w]ithin 90 days," then "the applicant may consider the

---

[1] "If an applicant submits to a political subdivision an application for a permit to engage in an activity described under par. (a), which contains all of the information required under par. (b), the political subdivision shall consider the application complete. If the political subdivision does not believe that the application is complete, the political subdivision shall notify the applicant in writing, within 10 days of receiving the application, that the application is not complete. The written notification shall specify in detail the required information that was incomplete. An applicant may resubmit an application as often as necessary until it is complete." Wis. Stat. § 66.0404(2)(c).

application approved," *id.*—a self-executing consequence that renders the application "deemed approved by operation of law." *Town of Fond du Lac*, 2025 WI App 21, ¶¶ 46–47, 50.

26. In addition to the 90-day shot clock and the "substantial evidence" requirement, the Mobile Tower Siting Law also imposes substantive limitations on local regulatory authority. Among other things, "a political subdivision may not":

> (c) Enact an ordinance prohibiting the placement of a mobile service support structure in particular locations within the political subdivision. . . .

> (g) Disapprove an application to [site a new tower] based solely on aesthetic concerns. . . .

> (h) Enact or enforce an ordinance related to radio frequency signal strength or the adequacy of mobile service quality. . . .

> (L) Disapprove an application based solely on the height of the mobile service support structure or on whether the structure requires lighting. . . .

> (p) Disapprove an application based on an assessment by the political subdivision of the suitability of other locations for conducting the activity. . . .

Wis. Stat. § 66.0404(4).

27. So long as they comply with the Telecommunications Act and Mobile Tower Siting Law discussed above, local governments like Bayfield County can regulate the siting and construction of telecommunications towers through their zoning ordinances. Bayfield County has chosen to do so here.

28. Under zoning ordinances, counties and other local governments "assign compatible land uses to zoning districts throughout the community." *Town of Rhine v. Bizzell*, 2008 WI 76, ¶ 17, 311 Wis. 2d 1, 751 N.W.2d 780 (citation omitted); *see* Wis.

Stat. § 59.69. Each district is classified by use, such as residential, commercial, or industrial. *See id.* Uses may be permitted as of right (permitted uses) or allowed by conditional use permit (conditional uses). *Id.* ¶¶ 19–20. (Conditional use permits are known as "CUPs.") Uses neither permitted nor conditionally permissible are prohibited. *Zwiefelhofer v. Town of Cooks Valley*, 2012 WI 7, ¶ 38, 338 Wis. 2d 488, 809 N.W.2d 362.

29.    Relevant here, Bayfield County designated "new mobile service support facilities"—such as telecommunications towers—as conditional uses in all zoning districts. Bayfield Cnty., Wis., Code § 13-1-43(d)(1)a.; *id.* § 13-1-62(a). To site and construct a tower anywhere in Bayfield County, an applicant must obtain a CUP.

30.    To administer their zoning authority, counties have discretion over their internal organization. A county board—the main governing body of a county—can keep all zoning authority for itself. But it doesn't have to. A county "may create a planning and zoning committee," Wis. Stat. § 59.69(2)(a)1., with "decision-making power" over "conditional use[s]," *id.* § 59.69(2)(bm); *see id.* § 59.69(2)(bs), (5e). A county also "may provide for the appointment of a board of adjustment," with its members chosen by the county board, *id.* § 59.694(1), (2)(a), that has the power to "hear and decide appeals where it is alleged there is error in" a "decision," *id.* § 59.694(7)(a); *see id.* § 59.694(4).

31.    A county can endow a board of adjustment with authority to hear appeals of the planning and zoning committee's CUP decisions—or it can choose to make the committee's CUP decisions final and not subject to board review. *Id.*

§ 59.69(5e)(e). If a county gives its board of adjustment authority to hear appeals of CUP decisions, and if a decision is appealed to the board, then only once the board has completed its review does a decision on the CUP application become final and judicially reviewable. *See Jefferson Cnty. v. Timmel*, 261 Wis. 39, 63–64, 51 N.W.2d 518 (1952); *see also* Wis. Stat. § 59.694(10). Also, if a planning and zoning committee grants a CUP, but a third party files an appeal to the board of adjustment, that appeal "shall stay all proceedings in furtherance of the action appealed from," meaning the applicant cannot act on the granted CUP pending board of adjustment review. Wis. Stat. § 59.694(5).

32.    Bayfield County has chosen to create both the Bayfield County Planning and Zoning Committee under § 59.69(2) and the Bayfield County Board of Adjustment under § 59.694(1). Bayfield Cnty., Wis., Code §§ 13-1-41(a)(2), 13-1-101A, 13-1-102, 13-1-102A. It has chosen to give the Board of Adjustment the power to hear appeals from all the Planning and Zoning Committee's decisions. *Id.* § 13-1-102(c)(1), (e)(1).

33.    Both the Planning and Zoning Committee and the Board of Adjustment thus play a role in the process for obtaining a CUP for a new telecommunications tower. To obtain such a CUP, an applicant must first submit an application for a CUP that complies with the general requirements for all CUPs, as well as requirements specific to telecommunications towers. *See* Bayfield Cnty., Wis., Code §§ 13-1-41(b)(1)–(2), 13-1-43(d)(1)–(2), (7). The Planning and Zoning Committee then reviews the application, holds a public hearing, and issues a decision to grant, deny, or grant

with conditions. *Id.* § 13-1-41(b)(3)–(4). The ordinances specify certain factors the Planning and Zoning Committee must consider. *See id.* §§ 13-1-41(c), 13-1-43(h). If nobody challenges the Planning and Zoning Committee's decision, it becomes final.

34.     If any "person aggrieved"—including a third party—appeals the Planning and Zoning Committee's CUP decision to the Board of Adjustment, that appeal "shall stay all proceedings in furtherance of the action appealed from." Wis. Stat. § 59.694(5); Bayfield Cnty., Wis., Code § 13-1-102(c)(1), (e)(1). The Board of Adjustment must hold a public hearing, can conduct de novo review, and can "reverse or affirm" the decision on appeal. Ord. § 13-1-103A(d)(2); *Osterhues v. Bd. of Adjustment for Washburn Cnty.*, 2005 WI 92, ¶ 2, 282 Wis. 2d 228, 698 N.W.2d 701. The Board of Adjustment then issues a decision. Bayfield Cnty., Wis., Code § 13-1-102A(g). Only once the Board of Adjustment issues its final decision can a person challenge it in court. *Jefferson Cnty.*, 261 Wis. at 63–64; *see also* Wis. Stat. § 59.694(10); 47 U.S.C. § 332(c)(7)(B)(v) (authorizing review of "final action" of local government); *Global Tower Assets, LLC v. Town of Rome*, 810 F.3d 77, 85–88 (1st Cir. 2016) (interpreting "final action" to mean after conclusion of all administrative remedies).

## II.    This Case

35.     The Bayfield County Comprehensive Plan—a "broad, policy-driven" "visionary blueprint" for county development—identifies a "[n]eed for better infrastructure, particularly cell phone and broadband internet connections." Bayfield Cnty., Wis., Comp. Plan 1, 1-4, *available at* https://bit.ly/49NnAdP.

36.     Within Bayfield County is the Town of Russell. Echoing the County's plan, the Town of Russell Comprehensive Plan expressly aims to "continue to develop

11

better communications," including "cellular," and to "[e]ncourage telecommunications companies to provide further services for current and future residents and businesses." Town of Russell, Wis., Comp. Plan 6, 8, 10, *available at* https://bit.ly/49ISbcr.

37.    Verizon Wireless provides wireless service in Bayfield County. Verizon has been experiencing a significant service gap in its network in and around the Town of Russell. Verizon customers using their devices in the gap area are likely to experience diminished call quality, slow and unreliable data transmission speeds, call drops, and blocked calls.

38.    Without a new telecommunications tower, Verizon services will remain unreliable for civilian users and for emergency responders.

39.    Cellular connectivity is also critically important for "emergency respon[ders]." Bayfield Cnty., Wis., Comp. Plan, *supra*, at 6-11; Town of Russell Res., *supra*. Yet the existing gap in coverage currently poses a public safety risk. The Bayfield County Highway Department, for example, relies on Verizon for wireless service. The Department has struggled with service in parts of the county for years.

40.    To address its service gap, Verizon identified a search area in which a new telecommunications tower needs to be located. The boundaries of the search area represent the outer limit of where a new tower could be constructed and still be effective.

41.    After careful investigation, Verizon identified no existing towers within the search area on which Verizon could collocate its equipment (i.e., share space on an existing tower).

42.     As a result, Verizon hired TowerNorth to identify a property within the search area that could accommodate a new telecommunications tower.

43.     Working together, Verizon and TowerNorth identified a parcel of private property in the Town of Russell, on which TowerNorth proposes to construct a tower for Verizon to locate its antennas and equipment. TowerNorth and the property owner entered into a lease agreement.

44.     The proposed tower will provide additional wireless communication services to an area that currently features minimal or inconsistent coverage. These services will benefit residents, workers, visitors, and emergency responders.

45.     Besides the services which will be provided by Verizon, the tower is designed to accommodate, by collocation, at least three additional wireless carriers.

46.     The proposed tower will not require any public participation or result in any public cost. In fact, the wireless communication services offered by Verizon Wireless are desired by both businesses and individuals and will be an economic asset to the community.

47.     The placement of the proposed tower was carefully chosen with the property owner to best conform with the current and potential future use(s) of the underlying property and to maximize the distance to the surrounding properties and uses.

48.     The tower will be obscured from surrounding vehicular, pedestrian, and residential view sheds by the natural topography and existing tree cover on the subject parcel and throughout the surrounding area.

49. On May 20, 2025, TowerNorth, through its agent Terra Consulting, submitted an application for a CUP to site and construct a new telecommunications tower in the Town of Russell in Bayfield County.

50. Bayfield County received TowerNorth's CUP application on May 20, 2025.

51. On May 30, Bayfield County requested additional information from TowerNorth. On June 17, TowerNorth provided the requested information. TowerNorth's application was "deemed complete" by Bayfield County on June 20.

52. After its application was deemed complete, TowerNorth supplemented its application with a certified appraisal showing that the tower will not measurably impact the value of surrounding properties.

53. On July 21, 2025, the Planning and Zoning Committee held a public hearing on TowerNorth's CUP application. At that meeting, the Committee voted to approve TowerNorth's application.

54. On July 31, the Committee issued a written decision documenting its approval.

55. On August 19, 2025, an appeal of the Planning and Zoning Committee's decision was filed with the Board of Adjustment by "Citizens for Land Use Transparency and Integrity" ("by Esme Martinson").

56. On multiple occasions, TowerNorth warned Defendants about the federal and state shot clocks, urging prompt action and preserving its argument that the shot clock had expired.

57.     On October 30, 2025, the Board of Adjustment held a public hearing and conducted de novo review of the Planning and Zoning Committee's decision. At that hearing, the Board voted to deny TowerNorth's CUP application.

58.     The Board of Adjustment's oral decision at the hearing came: 163 days after TowerNorth filed its application, 132 days after Bayfield County deemed Tower-North's application complete, and 72 days after the appeal was filed with the Board of Adjustment.

59.     On November 19, 2025, the Board of Adjustment issued a written decision documenting the denial.

60.     The decision was transmitted on Bayfield County letterhead, signed by the County Planning and Zoning Director.

61.     The Board of Adjustment's written decision at the hearing came: 183 days after TowerNorth filed its application, 152 days after Bayfield County deemed TowerNorth's application complete, and 92 days after the appeal was filed with the Board of Adjustment.

62.     Besides background facts, the Board of Adjustment's decision in its entirety provides the following reasons for the denial:

That on October 30, 2025 the Board held a De Novo Review Hearing of the Committee's granting of Tower North's CUP, and made the following determinations after review of substantial evidence:

a. The application or use proposed by Tower North is incompatible with the rural character and fails to preserve and protect the natural beauty and dark skies of the area, including the Apostle Islands National Lakeshore.

b. The application or use proposed by Tower North would have a negative impact on the Town of Russell's economy, including but not limited

15

to tourism and the local tax base, and would reduce property values of the real estate in the vicinity of the proposed cellular communication tower.

c. The application or use proposed by Tower North is inconsistent with the Town of Russell's and Bayfield County's comprehensive plans.

## FIRST CLAIM FOR RELIEF
### Violation of Wis. Stat. § 66.0404(2)(d)
### State Shot Clock

63.    The Wisconsin Mobile Tower Siting Law "sets forth certain actions a political subdivision must complete if it wishes to retain the ability to deny an application for a CUP." *State ex rel. U.S. Cellular Operating Co. LLC v. Town of Fond du Lac*, 2025 WI App 21, ¶ 50, 415 Wis. 2d 720, 19 N.W.3d 627.

64.    Called the "shot clock," the statute mandates that "[w]ithin 90 days of its receipt of a complete application, a political subdivision shall . . . [m]ake a *final decision* whether to approve or disapprove the application" and "[n]otify the applicant, in writing, of its final decision." Wis. Stat. § 66.0404(2)(d)2.–3.

65.    Plus, "[i]f the decision is to disapprove the application," the political subdivision must "include with the written notification substantial evidence which supports the decision"—also within that 90-day period. *Id.* § 66.0404(2)(d)4.

66.    If the "political subdivision" does not satisfy those requirements "[w]ithin 90 days," then "the applicant may consider the application approved." *Id.* § 66.0404(2)(d).

67.    TowerNorth's "complete application" was "recei[ved]" no later than June 20, 2025. This was the date the Wisconsin shot clock began to run. Wis. Stat. § 66.0404(2)(d).

68.     Ninety days later—the day the shot clock expired—was September 18, 2025.

69.     Within that 90-day shot clock, the Board of Adjustment did not "[m]ake a final decision," "[n]otify the applicant[ ] in writing," or "include . . . substantial evidence which supports the decision." Wis. Stat. § 66.0404(2)(d)2.–4.

70.     Accordingly, TowerNorth "may consider the application approved." *Id.* § 66.0404(2)(d). When a political subdivision violates the shot clock, as happened here, the Mobile Tower Siting Law spells out a consequence: TowerNorth "may consider the application approved." *Id.* § 66.0404(2)(d). This means the application is "deemed approved by operation of law." *Town of Fond du Lac*, 2025 WI App 21, ¶¶ 46–47, 50 (ordering declaratory judgment stating as much). TowerNorth is "entitled to proceed with the activity for which it sought approval in its application." *Id.* ¶¶ 46–47, 50.

71.     The Fourth Circuit, likewise, recently ruled in an applicant's favor in a nearly identical situation under a nearly identical Virginia law. *Tillman Infrastructure LLC v. Bd. of Supervisors of Culpeper Cnty.*, 2025 WL 2335966 (4th Cir. 2025).

72.     The Planning and Zoning Committee's interlocutory decision to approve the CUP does not change the fact that Defendants violated the shot clocks.

73.     The Mobile Tower Siting Law requires the "political subdivision" to "[m]ake a *final decision* whether to approve or disapprove the application" "[w]ithin 90 days." *Id.* § 66.0404(2)(d)2. (emphasis added). A "political subdivision" is "a city, village, town, or county." *Id.* § 66.0404(1)(p).

17

74.    Here, the political subdivision is Bayfield County. Both the Planning and Zoning Committee and the Board of Adjustment are constituent *parts of* Bayfield County.

75.    The Board of Adjustment's decision—not the Planning and Zoning Committee's—was the "final decision" of the "political subdivision," Bayfield County. Wis. Stat. § 66.0404(2)(d). The Planning and Zoning Committee's decision was merely an interlocutory decision.

76.    In sum, under Wisconsin law, Bayfield County had to—but did not—make a *final decision* within 90 days. There is no exception for pending administrative appeals, nor does the statute allow a political subdivision to extend the deadline by adding administrative-review processes. The same is true under federal law. *Global Tower Assets, LLC v. Town of Rome*, 810 F.3d 77, 85–88 (1st Cir. 2016).

77.    As was awarded in *Town of Fond du Lac* and *Tillman*, TowerNorth seeks declaratory relief stating that TowerNorth's CUP is deemed approved by operation of law. *See* Wis. Stat. §§ 806.04, 66.0404(2)(d); *see also* 28 U.S.C. § 2201.

78.    As a result of the defendants' delay, TowerNorth has suffered and will continue to suffer irreparable harm, including the inability to meet the needs of wireless service providers who are providing services to those in Bayfield County.

### SECOND CLAIM FOR RELIEF
### Violation of 47 U.S.C. § 332(c)(7)(B)(ii)
### Federal Shot Clock

79.    Defendants' tardy action also violated the 150-day federal shot clock.

80.    The federal shot clock began to run on May 20, 2025, the date TowerNorth submitted its application. 47 C.F.R. § 1.6003(e); FCC Order ¶ 141; *see* 47

U.S.C. § 332(c)(7)(B)(ii). The shot clock was tolled for 18 days—the period of time between when Bayfield County notified TowerNorth that additional information was needed and when TowerNorth provided that information. 47 C.F.R. § 1.6003(d)(2).

81.    Thus, the federal shot clock expired 168 days after TowerNorth submitted its application—on November 4.

82.    As of that date, the Board of Adjustment had not issued a decision "in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 337(c)(7)(B)(iii).

83.    Defendants therefore violated the federal shot clock.

84.    As a result of the defendants' delay, TowerNorth has suffered and will continue to suffer irreparable harm, including the inability to meet the needs of wireless service providers who are providing services to those in Bayfield County.

### THIRD CLAIM FOR RELIEF
### Violation of 47 U.S.C. § 332(c)(7)(B)(iii)
### Denial Not Supported by Substantial Evidence

85.    Under federal law, the denial had to "be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii).

86.    Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera v. NLRB*, 340 U.S. 474, 477 (1951) (quotations omitted). Although not necessarily a preponderance, "more than a scintilla of evidence" is required. *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999). "[C]ritical findings" must find "record support." *Orchard Hill Bldg. Co. v. U.S. Army Corps of Eng'rs*, 893 F.3d 1017, 1027 (7th Cir. 2018). At bottom, there must be *some evidence*—and that evidence must be

*substantiated*. *See id.* (reversing for lack of substantial evidence, where agency failed to "substantiate its say-so [and] . . . explain why it matters"); *T-Mobile Cent., LLC v. Charter Twp. of W. Bloomfield*, 691 F.3d 794, 800 (6th Cir. 2012) ("Substantial evidence should be substantiated."); *PrimeCo Pers. Commc'ns v. City of Mequon*, 352 F.3d 1147, 1150–51 (7th Cir. 2003).

87.    The substantial-evidence standard also requires a local government to set forth a "satisfactory explanation" for its findings and conclusions. *City of Roswell*, 574 U.S. at 301 (citing *State Farm*, 463 U.S. at 43).

88.    "Although the [Telecommunications Act] specifies how much evidence must be in the record for a municipality's denial of an application for a wireless facility to be upheld, the statute supplies no substantive criteria for municipalities to apply." *Primeco Pers. Commc'ns v. City of Mequon*, 242 F. Supp. 2d 567, 575 (E.D. Wis. 2003), *aff'd sub nom. PrimeCo*, 352 F.3d 1147 (7th Cir. 2003) (citing *Oyster Bay*, 166 F.3d at 495). "Such criteria are provided by state and local law." *Id.* (citing *Oyster Bay*, 166 F.3d at 495; *Cellular Tel. Co. v. Zoning Bd. of Adjustment of the Borough of Ho–Ho–Kus,* 197 F.3d 64, 72 (3d Cir. 1999)); *see W. Bloomfield*, 691 F.3d at 801 (looking to state substantive standards). To that end, the substantive limitations found in Wisconsin's Mobile Tower Siting Law also factor into substantial-evidence review.

89.    To begin, the denial is necessarily unsupported by substantial evidence, because none of the Board of Adjustment's findings or reasoning can be considered *at all*.

90.     Under federal law, the denial had to be "in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). And it had to be "in writing" within 150 days of receiving the application, plus tolling. *Id.* § 337(c)(7); 47 C.F.R. § 1.6003(c)(iv).

91.     As explained, no decision was made in writing by November 4, the day the federal shot clock expired.

92.     Due to their untimeliness, Defendants have forfeited the right to prepare any denial "in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii).

93.     Even if the Court were to review the denial decision, it lacks the support of substantial evidence.

94.     The Board of Adjustment's written decision flunks the substantial-evidence test. Aside from rote background facts, the Board's entire rationale for denial consists of three sentences. Separately and together, these sentences come up short.

95.     The Board of Adjustment's first sentence states: "The application or use proposed by Tower North is incompatible with the rural character and fails to preserve and protect the natural beauty and dark skies of the area, including the Apostle Islands National Lakeshore."

96.     This sentence fails on its face. It cites no evidence in support and is the "exact type of conclusory statement[ ] the Seventh Circuit has explained cannot satisfy the substantial evidence standard." *City of Milwaukee*, 2024 WL 329001, at *7.

97.    To be sure, a few objectors at the public hearing expressed their preferences for dark skies and no towers. But those statements do not count as substantial evidence. *See* Wis. Stat. § 59.69(5e)(a)2.

98.    Although the Board of Adjustment's decision neither explains this nor cites evidence in support, the concern about "natural beauty and dark skies" might relate to the tower's lighting. But federal regulations require lighting.

99.    The Board of Adjustment's second sentence states: "The application or use proposed by Tower North would have a negative impact on the Town of Russell's economy, including but not limited to tourism and the local tax base, and would reduce property values of the real estate in the vicinity of the proposed cellular communication tower."

100.    Like the first sentence, this sentence also fails on its face. It cites no evidence in support. It does not explain—to even a rudimentary level of specificity—*how* the proposed tower would negatively impact the Town's economy or reduce property values. This alone renders the sentence insufficient, as the Board "did not give [TowerNorth] even a basic explanation . . . that was tied to anything in the record," *City of Milwaukee*, 2024 WL 329001, at *6, and did not "articulate a satisfactory explanation for [its] action," *City of Roswell*, 574 U.S. at 301 (citation omitted).

101.    The notion that the tower will negatively impact the Town of Russell's tourism economy *directly contradicts* the Town's official findings in its resolution. According to the Town, "broadband and cellular capabilities are required to increase tourism, and the number-of nights stayed at campgrounds and hotels in the Town."

Town of Russell Res., *supra*. "[T]he Town of Russell residents and businesses are un-served or underserved by broadband and cellular services." *Id.*

102.    Next, consider the claim that the tower "would reduce property values of the real estate in the vicinity of the proposed cellular communication tower." No substantial evidence in the record shows that the tower would reduce property values "in the vicinity." Public comments at the hearing do not constitute substantial evi-dence because they are speculative and uncorroborated. Wis. Stat. § 59.69(5e)(a)2. Nor does the Citizens' "letter report" from Real Estate Dynamics supply substantial evidence regarding property values "in the vicinity of" the tower.

103.    In fact, the only evidence actually addressing the proposed tower's effect on "properties in the vicinity" is TowerNorth's certified appraiser's report concluding that "[t]he proposed cell tower development will not measurably impact the value of surrounding properties." Unlike the Citizens' letter report, TowerNorth's appraisal used a recognized appraisal technique—a "paired sales analysis of single-family homes located near cell towers in the local area"—to reach a conclusion about the value of property actually *in the vicinity of* the proposed tower.

104.    The Board of Adjustment's third and final sentence reads, in its entirety: "The application or use proposed by Tower North is inconsistent with the Town of Russell's and Bayfield County's comprehensive plans."

105.    This sentence yet again fails on its face. It cites no evidence in support. It does not explain—to any level of specificity—*how* the proposed tower is inconsistent with either comprehensive plan. This alone defeats the sentence, as the Board "did

not give [TowerNorth] even a basic explanation . . . that was tied to anything in the record," *City of Milwaukee*, 2024 WL 329001, at *6, and did not "articulate a satisfactory explanation for [its] action," *City of Roswell*, 574 U.S. at 301 (citation omitted).

106.    Instead, this sentence merely parrots the language of the Zoning Ordinance's factors for evaluating CUP applications, without adding any substance. Bayfield Cnty., Wis., Code § 13-1-41(c)(2), (4). But "[m]erely repeating an ordinance does not constitute substantial evidence." *W. Bloomfield*, 691 F.3d at 800.

107.    Now in litigation, the Board of Adjustment is bound by—and limited to—what its decision actually says. The Board's "*decision*"—not after-the-fact lawyering—"must 'describe the reasons for the denial and contain a sufficient explanation of those reasons.'" *City of Milwaukee*, 2024 WL 329001, at *6 (quoting *Helcher v. Dearborn Cnty.*, 595 F.3d 710, 718 (7th Cir. 2010)) (emphasis added); *see id.* ("[T]he TCA requires that the denial be in writing and supported by a written record; it cannot be a perfunctory or conclusory denial to be filled in after-the-fact if challenged.").

108.    As a result of the defendants' denial, TowerNorth has suffered and will continue to suffer irreparable harm, including the inability to meet the needs of wireless service providers who are providing services to those in Bayfield County.

### FOURTH CLAIM FOR RELIEF
### Violation of Wis. Stat. § 66.0404(2)(d)4.
### Denial Not Supported by Substantial Evidence

109.    Just like under federal law, under state law the denial had to be "in writing" and supported by "substantial evidence." Wis. Stat. § 66.0404(2)(d)3.–4.; *id.* § 59.69(5e)(b)2. (requiring CUP denials to be "supported by substantial evidence").

110. The state-law standard for substantial evidence mirrors the federal standard. In addition, substantial evidence, in the context of CUP denials like here, means "facts and information, other than merely personal preferences or speculation, directly pertaining to the requirements and conditions an applicant must meet to obtain a conditional use permit and that reasonable persons would accept in support of a conclusion." Wis. Stat. § 59.69(5e)(a)2.; *Gehin v. Wis. Grp. Ins. Bd.*, 2005 WI 16, ¶ 53, 278 Wis. 2d 111, 692 N.W.2d 572 ("[M]ere uncorroborated hearsay . . . does not constitute substantial evidence.").

111. To begin, the denial is necessarily unsupported by substantial evidence, because none of the Board of Adjustment's findings or reasoning can be considered *at all*.

112. Under state law, the denial also had to be "in writing" and supported by "substantial evidence." Wis. Stat. § 66.0404(2)(d)3.–4. And it had to be "in writing" within 90 days of receiving a complete application.

113. As explained, no decision was made—much less in writing—by September 18, the date the state shot clock expired.

114. "[H]aving failed to provide written notification" of its decision in time, Defendants "necessarily failed to identify the substantial evidence it relied upon in voting to deny [TowerNorth's] application." *Town of Fond du Lac*, 2025 WI App 21, ¶ 39.

115. Even if the Court were to review the denial decision, it lacks the support of substantial evidence. *See supra*.

116.   As a result of the defendants' denial, TowerNorth has suffered and will continue to suffer irreparable harm, including the inability to meet the needs of wireless service providers who are providing services to those in Bayfield County.

## FACTS SUPPORTING INJUNCTIVE RELIEF

117.   If the Court agrees that the defendants violated the Wisconsin state shot clock, then the corresponding injunctive relief is prohibitory. If a political subdivision violates the state shot clock, then "the applicant may consider the application approved," Wis. Stat. § 66.0404(2)(d)4, which Wisconsin courts have interpreted to mean "deemed approved by operation of law," *Town of Fond du Lac*, 2025 WI App 21, ¶¶ 46–47, 50. Under this self-executing mandate, the status quo is that TowerNorth's CUP application is *currently* approved. Accordingly, TowerNorth seeks prohibitory relief enjoining Defendants from interfering with TowerNorth's "entitle[ment] to proceed with the activity for which it sought approval in its application." *Id.* ¶¶ 46–47, 50.

118.   If the Court agrees that the defendants violated the federal Telecommunications Act—either by violating the federal shot clock or by failing to support the denial decision with substantial evidence—then the corresponding injunctive relief is mandatory. Unlike the Wisconsin Mobile Tower Siting Law, the Telecommunications Act does not specify a remedy. Yet as explained immediately below, the typical remedy for federal violations is a mandatory injunction ordering the local government to issue the permits sought. Accordingly, TowerNorth seeks mandatory relief enjoining the defendants to issue all necessary permits to allow TowerNorth to proceed with construction of the proposed tower.

26

119.    Caselaw confirms that when a local government violates the Telecommunications Act, "courts have held that the appropriate remedy is an order to issue the relevant permit" and that "no useful purpose would be served by remanding for further proceedings." *Primeco*, 242 F. Supp. 2d at 582. "Most courts," indeed, "have held" as much. *Cellco Partnership v. City of Milwaukee*, 2024 WL 329001, at *10 (E.D. Wis. 2024), *appeal dismissed*, 140 F.4th 854 (7th Cir. 2025).

120.    Wisconsin law goes further and actually specifies the remedy. If the political subdivision fails to meet the shot clock or to include "substantial evidence which supports [its] decision," then "the applicant may consider the application approved," Wis. Stat. § 66.0404(2)(d)4, which Wisconsin courts have interpreted to mean "deemed approved by operation of law," *Town of Fond du Lac*, 2025 WI App 21, ¶¶ 46–47, 50.

121.    Not only is injunctive relief the appropriate remedy, but courts routinely grant *preliminary* injunctions in cases like this one. *See, e.g.*, *Extenet Sys., LLC v. Vill. of Kings Point*, 2022 WL 1749200, at *20 (E.D.N.Y. May 31, 2022), *aff'd sub nom. Extenet Sys., LLC. v. Vill. of Kings Point*, 2023 WL 4044076 (2d Cir. June 16, 2023). Preliminary injunctions fulfill Congress's intent that action on applications be timely and that courts consider violations of the Telecommunications Act on an "expedited basis." 47 U.S.C. § 332(c)(7)(B)(v).

122.    Alternatively, the Court could convert the preliminary-injunction proceedings to an expedited final trial on the merits. Fed. R. Civ. P. 65(a)(2). Federal law expressly directs review on an "expedited basis." 47 U.S.C. § 332(c)(7)(B)(v). Propelled

by that directive, multiple courts have gone from complaint through final order in as little as five weeks. *See Iowa Wireless Servs., L.P. v. City of Moline, Ill.*, 29 F. Supp. 2d 915 (C.D. Ill. 1998); *see also BellSouth Mobility Inc. v. Gwinnett Cnty., Ga.*, 944 F. Supp. 923 (N.D. Ga. 1996).

123.    The Eastern District of Wisconsin recently did just that. After a city denied permits to build new telecommunications towers, an applicant sued under the Telecommunications Act and state law, and sought a preliminary injunction. *City of Milwaukee*, 2024 WL 329001, at *1. The Court converted the preliminary-injunction hearing to a final trial on the merits under Federal Rule of Civil Procedure 65(a)(2). *Id.* at *11; *see also USOC of Greater Iowa, Inc. v. City of Bellevue, Nebraska*, 279 F. Supp. 2d 1080, 1084 (D. Neb. 2003) (similar).

124.    TowerNorth will likely suffer irreparable harm in the absence of injunctive relief.

125.    First, there is no adequate remedy at law. The denial "cannot be compensated after the fact by monetary damages." *NMSURF, Inc. v. State of N.M. Dep't of Transp.*, 2021 WL 2646754, at *7 (D.N.M. 2021) (citing *City of Rancho Palos Verdes*, 544 U.S. at 122–23); *accord Extenet*, 2022 WL 1749200, at *12–13; *see also* FCC Order ¶ 123.

126.    Second, delay itself causes irreparable harm. As explained, a core purpose of both Telecommunications Act and the Mobile Tower Siting Law is to foster the speedy deployment of wireless infrastructure.

127. Defendants violated those laws and frustrated the purpose of those laws by, among other things, failing to act promptly.

128. As a result, TowerNorth "has suffered, and will continue to suffer an indeterminate harm from being delayed and prevented by the [defendants] from installing its wireless facilities, which harm cannot be accurately remedied through money damages." *Extenet*, 2022 WL 1749200, at *12. Indeed, "allowing the denial to stand would be inconsistent with the policies underlying the 1996 Act—i.e., insuring the speedy deployment of wireless services to the public which undoubtedly benefits from such technology." *Sprint Spectrum, L.P. v. Mills*, 65 F. Supp. 2d 148, 160–61 (S.D.N.Y. 1999) (finding policy of Telecommunications Act relevant to irreparable harm).

129. Relatedly, because of the shot-clock violation, TowerNorth is entitled to "consider its application approved." Wis. Stat. § 66.0404(2)(d); *Town of Fond du Lac*, 2025 WI App 21, ¶¶ 46–47, 50. But if TowerNorth actually were to proceed on that "consideration" and commence construction, it would expose itself to significant risk. Without a court order confirming that its application is "deemed approved by operation of law," *id.*, TowerNorth could be subject to penalties of thousands of dollars, *see* Bayfield Cnty., Wis., Code § 13-1-103(c), (d).

130. Third, "[i]f the preliminary injunction is not issued," TowerNorth "will suffer unquantifiable and irreparable harm in the form of" "loss of the ability to compete," "loss of goodwill," and "damage to its reputation." *Indep. Wireless One Corp. v. Town of Charlotte*, 242 F. Supp. 2d 409, 424 (D. Vt. 2003).

131.    As things stand, TowerNorth and Verizon are unable to provide coverage to customers and emergency responders in the service gap area.

132.    TowerNorth, moreover, operates in a highly competitive industry that seeks both to provide infrastructure-deployment services to carriers like Verizon and, ultimately, to provide adequate wireless service to consumers and emergency personnel.

133.    The delay and the denial at issue here will cause TowerNorth to lose business opportunities to other infrastructure developers.

134.    It will also cause TowerNorth's customer, Verizon, to likely suffer a loss of existing customers and the inability to attract new customers.

135.    This likely loss of business would be difficult, if not impossible, to quantify in monetary terms.

136.    TowerNorth and its customer, Verizon, will also likely suffer a loss of good will and damage to their reputations.

137.    Assigning a monetary value to this reputational harm would be difficult, if not impossible.

138.    Finally, injunctive relief—whether preliminary or permanent—is appropriate, because the alternative (remand to Bayfield County) would only compound the law-violating delay present here. FCC Order ¶ 123. That is why "courts have held that the appropriate remedy is an order to issue the relevant permit" and that "no useful purpose would be served by remanding for further proceedings." *Primeco*, 242 F. Supp. 2d at 582.

139.    In addition, the balance of equities tips in TowerNorth's favor.

140.    As explained above and below, TowerNorth will suffer irreparable harm without injunctive relief, and an injunction would serve the public interest. By contrast, Defendants will not suffer harm—especially irreparable harm—if the proposed tower is installed.

141.    Indeed, "the only right of which" the defendants "would be deprived by a preliminary or permanent injunction is the right to act on the siting application beyond a reasonable time period." FCC Order ¶ 123. But such a "right" "is not legally cognizable, because under [§ 332(c)(7)(B)(ii)], the [defendants have] no right to exercise this power." *Id.*

142.    Further, the proposed tower, once built, can be completely removed. If it is later determined on final judgment or appeal that a denial was lawful, TowerNorth can remove the tower and restore the land to its prior state.

143.    Finally, an injunction is in the public interest for several reasons.

144.    First, a preliminary injunction would serve the public interest by improving wireless coverage. Courts have recognized that "proper connectivity would clearly benefit consumers," *City of Milwaukee*, 2024 WL 329001, at *11, and that "access to wireless services is beneficial to the community at large" and serves the public interest. *NMSURF*, 2021 WL 2646754, at *8; FCC Order ¶¶ 1–2, 23–24.

145.    Both Bayfield County and the Town of Russell have declared, through official policies, that improved wireless coverage is necessary and in the public interest. The Bayfield County Comprehensive Plan identified a "[n]eed for better

infrastructure, particularly cell phone and broadband internet connections." Bayfield Cnty., Wis., Comp. Plan, *supra*, at 1-4. The persistence of "several dead areas" "that do not have cellular coverage" have "been a point of frustration with residents and visitors throughout the County." *Id.* at 4-6. Because cellular connectivity provides a "direct benefit to residents," "industry," and "emergency respon[ders]," *id.* at 6-11, "access to wireless communication facilities is becoming more and more important," and the "future siting of these facilities is done so in the best interest of the County and its residents," *id.* at 4-26–4-27.

146.    The Town of Russell Comprehensive Plan, for its part, aims to "continue to develop better communications," including "cellular," and to "[e]ncourage telecommunications companies to provide further services for current and future residents and businesses." Town of Russell, Wis., Comp. Plan, *supra*, at 6, 8, 10.

147.    Consistent with those policy statements, the record here establishes that the area TowerNorth seeks to serve suffers from poor wireless coverage. Without a new telecommunications tower, Verizon services will remain unreliable for civilian users and for emergency responders.

148.    The record also establishes that the proposed tower would improve coverage and serve the public interest. It will provide additional wireless communication services to an area that currently features minimal or inconsistent coverage. These services will benefit residents, workers, visitors, and emergency responders.

149.    Second, a preliminary injunction would serve the public interest by mitigating public safety risk. The Telecommunications Act itself exists to "make

available, so far as possible, to all people of the Unites States, without discrimination . . . a rapid, efficient, nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of national defense, [and] *for the purpose of promoting safety of life and property* through the use of wire and radio communications." 47 U.S.C. § 151 (emphasis added).

150.    A robust, functioning wireless network is indispensable to ensuring quick, effective emergency response. *See, e.g.*, *Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 546 (S.D.N.Y. 2009).

151.    In Bayfield County, cellular connectivity is critically important for "emergency respon[ders]." Bayfield Cnty., Wis., Comp. Plan, *supra*, at 6-11; Town of Russell Res., *supra*. Yet the existing gap in coverage currently poses a public safety risk.

152.    The Bayfield County Highway Department, for example, relies on Verizon for wireless service. The Department has struggled with service in parts of the county for years, including in the area of the proposed tower.

153.    Third and finally, the policies underlying the Telecommunications Act and the Wisconsin Mobile Tower Siting Law show that a preliminary injunction would serve the public interest.

154.    When a legislature "indicate[s] its purpose" either in statutory language or legislative history, that is "itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief." *Virginian Ry. Co. v. Sys. Fed'n*

*No. 40*, 300 U.S. 515, 551–52 (1937) (quoted approvingly in *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 784 (7th Cir. 2019)).

155.    In "an unusually important legislative enactment," *Reno v. ACLU*, 521 U.S. 844, 857 (1997), Congress enacted the Telecommunications Act to "encourage the rapid deployment of new telecommunications technologies," *Primeco*, 242 F. Supp. 2d at 574 (quoting Preamble, P.L. 104-104, 100 Stat. 56), and to "expand the availability of wireless telecommunications services," *Nextel Commc'ns of Mid-Atl., Inc. v. City of Cambridge*, 246 F. Supp. 2d 118, 122 (D. Mass. 2003); *see also* 47 U.S.C. § 151; FCC Order ¶¶ 14–22.

156.    "One of the means by which it sought to accomplish these goals was reduction of the impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers." *City of Rancho Palos Verdes*, 544 U.S. at 115. "The legislative history evidences clear congressional intent to take 'down the barriers' to telecommunications." *Primeco*, 242 F. Supp. 2d at 574 (quoting *Sprint Spectrum L.P. v. Town of Easton*, 982 F. Supp. 47, 50 (D. Mass. 1997)); *see* H.R. Conf. Rep. No. 104–458, 104th Cong., 2d Sess. 113 (1996), 1996 U.S.C.C.A.N. 10, 124.

157.    Moreover, Congress and the FCC have set forth a clear expectation that both local governments and courts decide disputes expeditiously. The Act directs local governments to decide applications within a reasonable time, 47 U.S.C. § 337(c)(7)(B)(ii), which FCC rules define as 150 days or fewer, 47 C.F.R.

§ 1.6003(c)(iv). Congress further provided that "court[s] shall hear and decide [actions under the Act] on an expedited basis." 47 U.S.C. § 332(c)(7)(B)(v).

158.    Animated by similar policy concerns as Congress, the Wisconsin Legislature also enacted the Mobile Tower Siting Law. Wis. Stat. § 66.0404; *see Town of Fond du Lac*, 2025 WI App 21, ¶¶ 35–36; *Savich*, 2024 WI App 43, ¶ 43. The state Siting Law, for its part, mandates a *shorter* shot clock—90 days—and directs a consequence for a political subdivision's violation—automatic approval. Wis. Stat. § 66.0404(2)(d); *Town of Fond du Lac*, 2025 WI App 21, ¶¶ 46–47, 50.

159.    Here, prompt relief furthers federal, state, and local policy goals *and* best remedies the particular unlawful conduct at issue. Defendants violated federal and state law by taking too long to act on TowerNorth's application. Wisconsin law, in particular, says what happens next: automatic approval by operation of law. For violations of the kind here, prompt injunctive relief is particularly appropriate and necessary to vindicate the purpose—and the textual commands—of relevant laws.

## PRAYER FOR RELIEF

WHEREFORE, TowerNorth respectfully requests that the Court:

A.    Conduct expedited review and disposition of this action under 47 U.S.C. § 332(c)(7)(B)(v);

B.    Preliminarily and permanently enjoin Defendants from interfering with TowerNorth's "entitle[ment] to proceed with the activity for which it sought approval in its application," *Town of Fond du Lac*, 2025 WI App 21, ¶¶ 46–47, 50;

C.    Preliminarily and permanently enjoin Defendants to approve Tower-North's permit application and to grant all necessary permits for construction and operation of the facilities proposed in that application;

D.    Declare that TowerNorth's permit application is deemed approved by operation of law under Wis. Stat. § 66.0404(2)(d);

E.    Issue an order reserving jurisdiction to this Court to resolve any issues between the parties as to further permit issues;

F.    Award costs and fees, including attorneys' fees, as may be available under law; and

G.    Award such other and further relief as the Court deems just and proper.

Dated: November 24, 2025

/s/ Joseph S. Diedrich
Joseph S. Diedrich
Rodney W. Carter
HUSCH BLACKWELL LLP
511 N. Broadway, Suite 1100
Milwaukee, WI 53202
414.978.5425

*Counsel to Plaintiff*