**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN**

|  |  |
|---|---|
| TOWERNORTH DEVELOPMENT, LLC,<br><br>Plaintiff,<br><br>v.<br><br>BAYFIELD COUNTY; and BAYFIELD COUNTY BOARD OF ADJUSTMENT,<br><br>Defendants. | Case No.: 3:25-cv-964 |

**BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................. 1

STATEMENT .................................................................................................................... 3

I.   Background Law .................................................................................................. 3

    A.   Federal Law .......................................................................................... 3

    B.   State Law ............................................................................................... 4

    C.   Bayfield County Zoning Law ................................................................ 6

    D.   Bayfield County Governmental Organization ...................................... 7

II.  This Case ............................................................................................................. 9

    A.   There is a need for a new telecommunications tower in rural Bayfield County in the Town of Russell. ............................................... 9

    B.   To address that need, TowerNorth submits an application for a CUP for a new telecommunications tower. ........................................... 12

    C.   The Planning and Zoning Committee initially decides to approve TowerNorth's application. .................................................................... 15

    D.   More than 90 days after TowerNorth's complete application was received, the Board of Adjustment denies TowerNorth's application. .......................................................................................... 16

ARGUMENT .................................................................................................................... 17

I.   TowerNorth is likely to succeed on the merits. ................................................. 18

    A.   The application is "deemed approved" because no final decision was timely issued. ............................................................................... 19

        1.   Because Bayfield County did not timely issue a final decision, the application is "deemed approved." ......................... 19

        2.   The Planning and Zoning Committee's interlocutory decision does not change that conclusion. ............................... 22

B.     The denial is not supported by substantial evidence............................ 27

         1.     The denial is not supported by substantial evidence because none of the Board of Adjustment's findings can be considered. ................................................................................. 29

         2.     Even if the Court were to review the denial decision, it lacks the support of substantial evidence.................................. 31

II.   TowerNorth is entitled to an injunction. ........................................................... 41

      A.     TowerNorth seeks prohibitory or mandatory injunctive relief, depending on which merits arguments the Court agrees with. ........... 42

      B.     Injunctive relief is the typical remedy in cases like this one. .............. 43

      C.     Injunctive relief is warranted now. ....................................................... 44

      D.     Without an injunction, TowerNorth will suffer irreparable harm........ 47

      E.     The balance of the equities weighs in TowerNorth's favor................... 51

      F.     An injunction will serve the public interest. ........................................ 52

CONCLUSION................................................................................................................. 59

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Textile Mfr. Inst., Inc. v. Donovan,*
452 U.S. 490 (1981) .......................................................................................... 39

*AT & T Commc'ns of Sw., Inc. v. City of Dallas,*
8 F. Supp. 2d 582 (N.D. Tex. 1998)........................................................... 45, 49, 50

*AT & T Mobility Servs., LLC v. Vill. of Corrales,*
127 F. Supp. 3d 1169 (D.N.M. 2015) ...................................................................... 44

*AT&T Wireless PCS, Inc. v. Town of Porter,*
203 F. Supp. 2d 985 (N.D. Ind. 2002) .................................................................... 27

*Bell Atl. Mobile of Rochester L.P. v. Town of Irondequoit,*
848 F. Supp. 2d 391 (W.D.N.Y. 2012)............................................................... 44, 48

*BellSouth Mobility Inc. v. Gwinnett Cnty., Ga.,*
944 F. Supp. 923 (N.D. Ga. 1996) ........................................................................ 46

*Bigbee v. Nalley,*
482 F. Supp. 2d 1092 (W.D. Wis. 2007).................................................................. 25

*Brehmer v. Plan. Bd. of Town of Wellfleet,*
238 F.3d 117 (1st Cir. 2001)................................................................................ 44

*Cellco Partnership v. City of Milwaukee,*
2024 WL 329001 (E.D. Wis. 2024)................................................................... passim

*Cellular Tel. Co. v. Town of Oyster Bay,*
166 F.3d 490, 497 (2d Cir. 1999) ...................................................................... 28, 29

*Cellular Tel. Co. v. Zoning Bd. of Adjustment of the Borough of Ho–Ho–Kus,*
197 F.3d 64 (3d Cir. 1999)................................................................................... 29

*City of Rancho Palos Verdes v. Abrams,*
544 U.S. 113 (2005) ............................................................................. 3, 46, 47, 57

*Consol. Edison Co. of N.Y. v. N.L.R.B.,*
305 U.S. 197 (1938) ........................................................................................... 37

iv

*Cook Cnty. v. Wolf,*
962 F.3d 208 (7th Cir. 2020) .......................................................................... 18

*Cox Commc'ns PCS, L.P. v. City of San Marcos,*
204 F. Supp. 2d 1260 (S.D. Cal. 2002)........................................................... 49

*Crown Castle Fiber, L.L.C. v. City of Pasadena,*
76 F.4th 425 (5th Cir. 2023)........................................................................... 49

*Darby v. Cisneros,*
509 U.S. 137 (1993) ....................................................................................... 25

*Extenet Sys., LLC v. Vill. of Kings Point,*
2022 WL 1749200 (E.D.N.Y. May 31, 2022)............................................. 44, 47, 48

*FTC v. Credit Bureau Ctr., LLC,*
937 F.3d 764 (7th Cir. 2019) .......................................................................... 56

*Gehin v. Wis. Grp. Ins. Bd.,*
2005 WI 16, 278 Wis. 2d 111, 692 N.W.2d 572 ....................................................... 28

*Genuine Parts Co. v. EPA,*
890 F.3d 304 (D.C. Cir. 2018) ................................................................... 39, 40

*Global Tower Assets, LLC v. Town of Rome,*
810 F.3d 77 (1st Cir. 2016)........................................................................... 9, 27

*Indep. Wireless One Corp. v. Town of Charlotte,*
242 F. Supp. 2d 409 (D. Vt. 2003)........................................................... 45, 49, 50

*Iowa Utilities Bd. v. F.C.C.,*
109 F.3d 418 (8th Cir. 1996) .......................................................................... 50

*Iowa Wireless Servs., L.P. v. City of Moline, Ill.,*
29 F. Supp. 2d 915 (C.D. Ill. 1998) ................................................................. 46

*Jefferson Cnty. v. Timmel,*
261 Wis. 39, 51 N.W.2d 518 (1952)............................................................. 7, 9, 24

*Kimberly Area Sch. Dist. v. Lab. & Indus. Rev. Comm'n,*
2005 WI App 262, 288 Wis. 2d 542, 707 N.W.2d 872 ............................................. 25

*Life Spine Inc. v. Aegis Spine, Inc.,*
8 F.4th 531 (7th Cir. 2021)............................................................................. 50

*Mays v. Dart,*
974 F.3d 810 (7th Cir. 2020) .......................................................................... 42

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,*
463 U.S. 29 (1983) ............................................................... 4, 29, 38, 40

*Nat'l Tower, LLC v. Plainville Zoning Bd.,*
297 F.3d 14 (1st Cir. 2002)................................................................ 41

*New Cingular Wireless PCS, LLC v. Town of Colonie,*
2022 WL 1009436 (N.D.N.Y. 2022) ..................................... 21, 30, 51, 52

*New Cingular Wireless PCS, LLC v. Town of Greenfield,*
2010 WL 3528830 (D.N.H. 2010)........................................................ 52

*New Jersey Payphone Ass'n, Inc. v. Town of W. New York,*
130 F. Supp. 2d 631 (D.N.J. 2001)...................................................... 51

*Nextel Commc'ns of Mid-Atl., Inc. v. City of Cambridge,*
246 F. Supp. 2d 118 (D. Mass. 2003)................................................... 57

*Nextel Partners, Inc. v. Kingston Twp.,*
286 F.3d 687 (3d Cir. 2002)............................................................... 43

*NMSURF, Inc. v. State of N.M. Dep't of Transp.,*
2021 WL 2646754, at *9 (D.N.M. 2021) ........................................ passim

*Ogden Fire Co. No. 1 v. Upper Chichester TP.,*
504 F.3d 370 (3d Cir. 2007)............................................................... 41

*Omnipoint Commc'ns, Inc. v. Town of LaGrange,*
658 F. Supp. 2d 539 (S.D.N.Y. 2009)................................................... 55

*Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp.,*
181 F.3d 403 (3d Cir. 1999)............................................................... 44

*Orange Cnty.-Poughkeepsie Ltd. P'ship v. Town of E. Fishkill,*
84 F. Supp. 3d 274 (S.D.N.Y.) ........................................................... 28

*Orchard Hill Bldg. Co. v. U.S. Army Corps of Eng'rs,*
893 F.3d 1017 (7th Cir. 2018) ...................................................... passim

*Osterhues v. Bd. of Adjustment for Washburn Cnty.,*
2005 WI 92, 282 Wis. 2d 228, 698 N.W.2d 701 .......................... 9, 23, 24

*Preferred Sites, LLC v. Troup Cnty.,*
296 F.3d 1210 (11th Cir. 2002) .......................................................... 43

*Primeco Pers. Commc'ns v. City of Mequon,*
   242 F. Supp. 2d 567 (E.D. Wis. 2003) ................................................................ passim

*PrimeCo Pers. Commc'ns v. City of Mequon,*
   352 F.3d 1147 (7th Cir. 2003) ............................................................................ passim

*Puerto Rico Tel. Co. v. Municipality of Aguada,*
   2025 WL 1906724 (D.P.R. 2025) .............................................................................. 44

*Qwest Commc'ns Corp. v. City of Berkeley,*
   146 F. Supp. 2d 1081 (N.D. Cal. 2001) .................................................................... 49

*Reno v. ACLU,*
   521 U.S. 844 (1997) ................................................................................................. 56

*Riley v. California,*
   573 U.S. 373 (2014) ................................................................................................. 52

*Savich v. Columbia Cnty. Bd. of Adjustment,*
   2024 WI App 43, 413 Wis. 2d 140, 11 N.W.3d 160 ............................................. 4, 58

*Sprint Spectrum L.P. v. Town of Easton,*
   982 F. Supp. 47 (D. Mass. 1997) ............................................................................. 57

*Sprint Spectrum L.P. v. Willoth,*
   176 F.3d 630 (2d Cir. 1999) ..................................................................................... 28

*Sprint Spectrum, L.P. v. Mills,*
   65 F. Supp. 2d 148 (S.D.N.Y. 1999) ............................................................. 45, 48, 59

*State ex rel. United States Cellular Operating Co. LLC v. Town of
   Fond du Lac,*
   2025 WI App 21, , 415 Wis. 2d 720, 19 N.W.3d 627 ........................................ passim

*State v. Yakich,*
   2022 WI 8, 400 Wis. 2d 549, 970 N.W.2d 12 ........................................................... 22

*Telecorp Realty, LLC v. Town of Edgartown,*
   81 F. Supp. 2d 257 (D. Mass. 2000) .......................................................... 45, 48, 49, 51

*Tennessee ex rel. Wireless Income Props., LLC v. City of Chattanooga,*
   403 F.3d 392 (6th Cir. 2005) .................................................................................... 43

*T-Mobile Cent., LLC v. Charter Twp. of W. Bloomfield,*
   691 F.3d 794 (6th Cir. 2012) ............................................................................... passim

*T-Mobile Cent., LLC v. Unified Gov't of Wyandotte Cnty.*,
546 F.3d 1299 (10th Cir. 2008) ................................................................ 57

*T-Mobile Ne. LLC v. City of Lawrence*,
755 F. Supp. 2d 286 (D. Mass. 2010) ...................................................... 45

*T-Mobile S., LLC v. City of Roswell*,
574 U.S. 293 (2015) ......................................................................... passim

*Town of Rhine v. Bizzell*,
2008 WI 76, 311 Wis. 2d 1, 751 N.W.2d 780 ............................................ 6

*Universal Camera v. NLRB*,
340 U.S. 474 (1951) ...................................................... 28, 38, 39, 40

*Upstate Cellular Network v. City of Auburn*,
257 F. Supp. 3d 309 (N.D.N.Y. 2017) ...................................................... 43

*USOC of Greater Iowa, Inc. v. City of Bellevue*,
279 F. Supp. 2d 1080 (D. Neb. 2003) ................................................ 44, 46

*Vertex Tower Assets, LLC v. Town of Canton*,
731 F. Supp. 3d 174 (D. Mass. 2024) ...................................................... 33

*Tillman Infrastructure LLC v. Bd. of Supervisors of Culpeper Cnty.*,
2025 WL 2335966 (4th Cir. 2025) ..................................................... 20, 21

*Virginian Ry. Co. v. Sys. Fed'n No. 40*,
300 U.S. 515 (1937) ................................................................................ 56

*Whole Woman's Health All. v. Hill*,
937 F.3d 864 (7th Cir. 2019) ...................................................... 18, 51, 52

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7, (2008) ............................................................................ 18, 19

*Zwiefelhofer v. Town of Cooks Valley*,
2012 WI 7, 338 Wis. 2d 488, 809 N.W.2d 362 .......................................... 7

## Statutes

47 U.S.C. § 151 ......................................................................... 3, 55, 57

47 U.S.C. § 253 ................................................................................ 3

47 U.S.C. § 303(q) .............................................................................. 33

47 U.S.C. § 332(c)(7)(B) ............................................................................... passim

Va. Code Ann. § 15.2-2316.4:1.................................................................................. 21

Wis. Stat. § 59.69(2)................................................................................................... 7

Wis. Stat. § 59.69(5e) ..................................................................... 29, 32, 36, 37

Wis. Stat. § 59.694(5)...................................................................... 8, 23, 24

Wis. Stat. § 59.694(10)........................................................................... 7, 9, 24

Wis. Stat. § 66.0404(2)(a) ........................................................................ 4

Wis. Stat. § 66.0404(2)(c)........................................................................ 5

Wis. Stat. § 66.0404(2)(d) ........................................................... passim

Wis. Stat. § 66.0404(2)(f) ................................................................ 24

Wis. Stat. § 66.0404(4)................................................................ passim

Wis. Stat. § 66.0414(3)............................................................................ 31

Wis. Stat. § 66.1001 ................................................................................. 9

Wis. Stat. § 781.10(1)............................................................................. 22

**Rules**

Fed. R. Civ. P. 26(a)(1)....................................................................... 46

Fed. R. Civ. P. 65(a)(2)................................................................. 45, 46

**Regulations**

47 C.F.R. § 1.6003(b).......................................................................... 4

47 C.F.R. § 1.6003(c) ............................................................. 3, 30, 57

47 C.F.R. § 1.6003(d) ...................................................................... 21

47 C.F.R. § 1.6003(e)........................................................................ 21

47 C.F.R. § 17.21................................................................................. 33

47 C.F.R. § 17.23.................................................................................33

ix

FCC, *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 F.C.C. Rcd. 9088 (2018) .................................. passim

**Other Authorities**

2013 Wis. Act 20 ......................................................................................... 26

2 Admin. L. & Prac. § 5:27 (3d ed.) ............................................................ 25

83 Am. Jur. 2d Zoning and Planning § 854 ................................................ 25

Bayfield Cnty. Wis. Code § 13-1-41(a) ......................................... 8, 23, 58

Bayfield Cnty. Wis. Code § 13-1-41(b) ................................................ 8, 23

Bayfield Cnty. Wis. Code § 13-1-41(c) ......................................... 8, 9, 10, 39

Bayfield Cnty. Wis. Code § 13-1-43(d) ........................................... 7, 8, 58

Bayfield Cnty. Wis. Code § 13-1-43(h). ...................................................... 8

Bayfield Cnty. Wis. Code § 13-1-62(a). ...................................................... 7

Bayfield Cnty. Wis. Code § 13-1-101A. ................................................ 8, 23

Bayfield Cnty. Wis. Code § 13-1-102(c) .............................................. 8, 9, 23

Bayfield Cnty. Wis. Code § 13-1-102(e) .............................................. 8, 9, 23

Bayfield Cnty. Wis. Code § 13-1-102A ................................................ 8, 23

Bayfield Cnty. Wis. Code § 13-1-102A(g). ............................................ 9, 23

Bayfield Cnty. Wis. Code § 13-1-102A(i) ................................................ 23

Bayfield Cnty. Wis. Code § 13-1-103(c) .................................................. 49

Bayfield Cnty. Wis. Code § 13-1-103(d). ................................................. 49

Bayfield Cnty. Wis. Code § 13-1-103A(d) ...................................... 9, 23, 24

Bayfield Cnty., Wis., Comp. Plan ....................................................... passim

Charles H. Koch et al., 2 Admin. L. & Prac. § 5:27 (3d ed.) .................... 25

H.R. Conf. Rep. No. 104–458, 104th Cong., 2d Sess. 113 (1996), 1996 U.S.C.C.A.N. 10, 124 .................................................................. 57

Telecommunications Act P.L. 104-104, 100 Stat. 56 (1996) .............................. 1, 3, 57

Town of Russell, Wis., Comp. Plan .................................................................... passim

Town of Russell, Wis., Resolution 16-10 ............................................................ passim

**INTRODUCTION**

In the far northern reaches of Wisconsin, a rural area of Bayfield County lacks reliable cellular coverage. Verizon Wireless customers experience call drops, blocked calls, diminished call quality, messaging failures, and slow data. Throughout the year—but especially in treacherous Northwoods snowstorms—the lack of coverage delays emergency response and imperils public safety.

Verizon and its partner, TowerNorth, know all this based on a radiofrequency engineering analysis, the input of the Bayfield County Highway Department, anecdotal information from customers in the area, and official policy statements of Bayfield County and the Town of Russell. They also know exactly how to cure the service gap: install a new telecommunications tower in the area. TowerNorth applied to Bayfield County for a permit to do just that.

But Bayfield County and its Board of Adjustment blocked TowerNorth's ready solution—both by delaying action on TowerNorth's application and by ultimately denying it. The defendants' delay and denial violate both the federal Telecommunications Act of 1996 and the Wisconsin Mobile Tower Siting Law. 47 U.S.C. § 332; Wis. Stat. § 66.0404.

Congress enacted the Telecommunications Act "to encourage the rapid deployment of new telecommunications technologies." Preamble, P.L. 104-104, 100 Stat. 56 (1996). It expressly directed local governments to act on applications quickly and courts to "hear and decide" claims under the Act "on an expedited basis." 47 U.S.C. § 332(c)(7)(B)(v). Wisconsin enacted its own Mobile Tower Siting Law to accomplish similar objectives.

1

Both the Telecommunications Act and the Siting Law establish "shot clocks"—periods of time by which local governments must act on applications for new telecommunications infrastructure. Wisconsin law in particular specifies a consequence for a local government's failure to timely act: the application is "deemed approved by operation of law." *State ex rel. United States Cellular Operating Co. LLC v. Town of Fond du Lac*, 2025 WI App 21, ¶¶ 46–47, 50, 415 Wis. 2d 720, 19 N.W.3d 627. Here, the defendants violated both the state and federal shot clocks by miring TowerNorth's application in a cumbersome—and legally unnecessary—administrative appeals process. The result is that TowerNorth's permit is deemed approved. TowerNorth accordingly seeks an order enjoining the defendants from interfering with TowerNorth's construction of the proposed tower under the permit.

In addition, both the Telecommunications Act and the Siting Law require denials to be supported by substantial evidence and an adequate explanation. Even if the Court finds that the defendants met the shot clocks, the Board of Adjustment's denial still violates federal and state law because it lacks the support of substantial evidence and an adequate explanation. The standard remedy for such violations is a mandatory injunction ordering the local government to issue the denied permits.

Ultimately, prompt injunctive relief is warranted. Without it, the tower won't go up, TowerNorth will suffer irreparable harm, and Bayfield County residents, visitors, and emergency personnel will continue to suffer through unnecessary service gaps and public-safety risks going into this northern Wisconsin winter. The Court should grant TowerNorth's motion.

**STATEMENT**

## I.     Background Law

The siting and construction of telecommunications towers is governed by federal, state, and local law.

### A.     Federal Law

Starting at the top, Congress enacted the Telecommunications Act of 1996 "to encourage the rapid deployment of new telecommunications technologies." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005) (quoting Preamble, P.L. 104-104, 100 Stat. 56 (1996)); 47 U.S.C. § 151. To that end, the Act contains various provisions for the "reduction of the impediments imposed by local governments upon the installation of facilities for wireless communications." *City of Rancho Palos Verdes*, 544 U.S. at 115; *see id.* (explaining that the Act "imposes specific limitations on the traditional authority of state and local governments to regulate the location, construction, and modification of" telecommunications infrastructure). *See generally* 47 U.S.C. §§ 253, 332.

Relevant here, the Act sets a deadline for local government action, colloquially known as a "shot clock." A local government must decide an application to construct a tower "within a reasonable period of time," 47 U.S.C. § 337(c)(7)(B)(ii), which FCC rules define as 150 days or fewer, 47 C.F.R. § 1.6003(c)(iv). This federal shot clock "begins to run when an application is first submitted, not when the application is deemed complete," subject to any tolling. FCC, *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 F.C.C. Rcd. 9088,

3

¶ 141 (2018) (FCC Order), *available at* https://bit.ly/4oVBhf4; *see* 47 C.F.R. § 1.6003(b), (d).

If a local government denies an application to construct a tower, moreover, its decision "shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 337(c)(7)(B)(iii). The decision "must provide reasons" and "articulate a satisfactory explanation for its action" in a written document "issued essentially contemporaneously with the denial." *T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 302, 307 (2015) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)).

Finally, the Act creates a federal cause of action for judicial review of a local government's "final action." 47 U.S.C. § 337(c)(7)(B)(v). Courts "shall hear and decide such action on an expedited basis." *Id.*

### B.    State Law

Animated by similar policy concerns as Congress, the Wisconsin Legislature also enacted a Mobile Tower Siting Law that limits local control over telecommunications towers. Wis. Stat. § 66.0404; *see Town of Fond du Lac*, 2025 WI App 21, ¶¶ 35–36; *Savich v. Columbia Cnty. Bd. of Adjustment*, 2024 WI App 43, ¶ 43, 413 Wis. 2d 140, 11 N.W.3d 160. "A political subdivision," such as a county, "may regulate the activities described under par. (a)," including the siting and construction of new telecommunications towers, "*only* as provided in [§ 66.0404]." Wis. Stat. § 66.0404(2)(a), (h) (emphasis added).

More stringent than its federal counterpart, Wisconsin's shot clock is shorter in time and includes a defined consequence for untimeliness:

4

> Within 90 days of its receipt of a complete application,[1] a political subdivision shall complete all of the following . . .
>
> 1. Review the application to determine whether it complies with all applicable aspects of the political subdivision's building code and, subject to the limitations in this section, zoning ordinances.
>
> 2. Make a final decision whether to approve or disapprove the application.
>
> 3. Notify the applicant, in writing, of its final decision.
>
> 4. If the decision is to disapprove the application, include with the written notification substantial evidence which supports the decision.

*Id.* § 66.0404(2)(d). (Unlike the federal shot clock, the state shot clock begins to run only after an application is deemed complete.) If a political subdivision fails to complete all four steps "[w]ithin 90 days," then "the applicant may consider the application approved," *id.*—a self-executing consequence that renders the application "deemed approved by operation of law." *Town of Fond du Lac*, 2025 WI App 21, ¶¶ 46–47, 50.

In addition to the 90-day shot clock and the "substantial evidence" requirement, the Mobile Tower Siting Law also imposes substantive limitations on local regulatory authority. Among other things, "a political subdivision may not":

---

[1] "If an applicant submits to a political subdivision an application for a permit to engage in an activity described under par. (a), which contains all of the information required under par. (b), the political subdivision shall consider the application complete. If the political subdivision does not believe that the application is complete, the political subdivision shall notify the applicant in writing, within 10 days of receiving the application, that the application is not complete. The written notification shall specify in detail the required information that was incomplete. An applicant may resubmit an application as often as necessary until it is complete." Wis. Stat. § 66.0404(2)(c).

(c) Enact an ordinance prohibiting the placement of a mobile service support structure in particular locations within the political subdivision. . . .

(g) Disapprove an application to [site a new tower] based solely on aesthetic concerns. . . .

(h) Enact or enforce an ordinance related to radio frequency signal strength or the adequacy of mobile service quality. . . .

(L) Disapprove an application based solely on the height of the mobile service support structure or on whether the structure requires lighting. . . .

(p) Disapprove an application based on an assessment by the political subdivision of the suitability of other locations for conducting the activity. . . .

Wis. Stat. § 66.0404(4).

## C.    Bayfield County Zoning Law

So long as they comply with the Telecommunications Act and Mobile Tower Siting Law discussed above, local governments like Bayfield County can regulate the siting and construction of telecommunications towers through their zoning ordinances. Bayfield County has chosen to do so here.

Under zoning ordinances, counties and other local governments "assign compatible land uses to zoning districts throughout the community." *Town of Rhine v. Bizzell*, 2008 WI 76, ¶ 17, 311 Wis. 2d 1, 751 N.W.2d 780 (citation omitted); *see* Wis. Stat. § 59.69. Each district is classified by use, such as residential, commercial, or industrial. *See id.* Uses may be permitted as of right (permitted uses) or allowed by conditional use permit (conditional uses). *Id.* ¶¶ 19–20. (Conditional use permits are known as "CUPs.") Uses neither permitted nor conditionally permissible are

6

prohibited. *Zwiefelhofer v. Town of Cooks Valley*, 2012 WI 7, ¶ 38, 338 Wis. 2d 488, 809 N.W.2d 362.

Relevant here, Bayfield County designated "new mobile service support facilities"—such as telecommunications towers—as conditional uses in all zoning districts. Bayfield Cnty., Wis., Code § 13-1-43(d)(1)a.; *id.* § 13-1-62(a). To site and construct a tower anywhere in Bayfield County, an applicant must obtain a CUP.

### D.    Bayfield County Governmental Organization

To administer their zoning authority, counties have discretion over their internal organization. A county board—the main governing body of a county—can keep all zoning authority for itself. But it doesn't have to. A county "may create a planning and zoning committee," Wis. Stat. § 59.69(2)(a)1., with "decision-making power" over "conditional use[s]," *id.* § 59.69(2)(bm); *see id.* § 59.69(2)(bs), (5e). A county also "may provide for the appointment of a board of adjustment," with its members chosen by the county board, *id.* § 59.694(1), (2)(a), that has the power to "hear and decide appeals where it is alleged there is error in" a "decision," *id.* § 59.694(7)(a); *see id.* § 59.694(4).

A county can endow a board of adjustment with authority to hear appeals of the planning and zoning committee's CUP decisions—or it can choose to make the committee's CUP decisions final and not subject to board review. *Id.* § 59.69(5e)(e). If a county gives its board of adjustment authority to hear appeals of CUP decisions, and if a decision is appealed to the board, then only once the board has completed its review does a decision on the CUP application become final and judicially reviewable. *See Jefferson Cnty. v. Timmel*, 261 Wis. 39, 63–64, 51 N.W.2d 518 (1952); *see also* Wis.

7

Stat. § 59.694(10). Also, if a planning and zoning committee grants a CUP, but a third party files an appeal to the board of adjustment, that appeal "shall stay all proceedings in furtherance of the action appealed from," meaning the applicant cannot act on the granted CUP pending board of adjustment review. Wis. Stat. § 59.694(5).

Bayfield County has chosen to create both the Bayfield County Planning and Zoning Committee under § 59.69(2) and the Bayfield County Board of Adjustment under § 59.694(1). Bayfield Cnty., Wis., Code §§ 13-1-41(a)(2), 13-1-101A, 13-1-102, 13-1-102A. It has chosen to give the Board of Adjustment the power to hear appeals from all Planning and Zoning Committee decisions. *Id.* § 13-1-102(c)(1), (e)(1).

Both the Planning and Zoning Committee and the Board of Adjustment thus play a role in the process for obtaining a CUP for a new telecommunications tower. To obtain such a CUP, an applicant must first submit an application that complies with the general requirements for all CUPs, as well as requirements specific to telecommunications towers. *See id.* §§ 13-1-41(b)(1)–(2), 13-1-43(d)(1)–(2), (7). The Planning and Zoning Committee then reviews the application, holds a public hearing, and issues a decision to grant, deny, or grant with conditions. *Id.* § 13-1-41(b)(3)–(4). The ordinances specify certain factors the Planning and Zoning Committee must consider. *See id.* §§ 13-1-41(c), 13-1-43(h). If nobody challenges the Planning and Zoning Committee's decision, it becomes final.

If any "person aggrieved"—including a third party—appeals the Planning and Zoning Committee's CUP decision to the Board of Adjustment, that appeal "shall stay all proceedings in furtherance of the action appealed from." Wis. Stat. § 59.694(5);

8

Bayfield Cnty., Wis., Code § 13-1-102(c)(1), (e)(1). The Board of Adjustment must hold a public hearing, can conduct de novo review, and can "reverse or affirm" the decision on appeal. Bayfield Cnty., Wis., Code § 13-1-103A(d)(2); *Osterhues v. Bd. of Adjustment for Washburn Cnty.*, 2005 WI 92, ¶ 2, 282 Wis. 2d 228, 698 N.W.2d 701. The Board of Adjustment then issues a decision. Bayfield Cnty., Wis., Code § 13-1-102A(g). Only once the Board of Adjustment issues its final decision can a person challenge it in court. *Jefferson Cnty.*, 261 Wis. at 63–64; *see also* Wis. Stat. § 59.694(10); 47 U.S.C. § 332(c)(7)(B)(v) (authorizing review of "final action" of local government); *Global Tower Assets, LLC v. Town of Rome*, 810 F.3d 77, 85–88 (1st Cir. 2016) (interpreting "final action" to mean after conclusion of all administrative remedies).

## II.    This Case

### A.    There is a need for a new telecommunications tower in rural Bayfield County in the Town of Russell.

The Bayfield County Comprehensive Plan—a "broad, policy-driven" "visionary blueprint" for county development—identifies a "[n]eed for better infrastructure, particularly cell phone and broadband internet connections." Bayfield Cnty., Wis., Comp. Plan 1, 1-4, *available at* https://bit.ly/49NnAdP; *see* Bayfield Cnty., Wis., Code § 13-1-41(c)(4) (stating that county plans are relevant to CUP decisions); Wis. Stat. § 66.1001. Although "[w]ireless telephone service is available throughout most of the County" and "[a]dditional towers have been constructed over the past several years," there still "are several dead areas" and "areas that do not have cellular coverage." Bayfield Cnty., Wis., Comp. Plan, *supra*, at 4-6. These coverage gaps have "been a

9

point of frustration with residents and visitors throughout the County." *Id.* Because cellular connectivity provides a "direct benefit to residents," "industry," and "emergency respon[ders]," *id.* at 6-11, "access to wireless communication facilities is becoming more and more important," and the "future siting of these facilities is done so in the best interest of the County and its residents," *id.* at 4-26–4-27.

Within Bayfield County is the Town of Russell. Echoing the County's plan, the Town of Russell Comprehensive Plan expressly aims to "continue to develop better communications," including "cellular," and to "[e]ncourage telecommunications companies to provide further services for current and future residents and businesses." Town of Russell, Wis., Comp. Plan 6, 8, 10, *available at* https://bit.ly/49ISbcr; *see* Bayfield Cnty., Wis., Code § 13-1-41(c)(2) (stating that town plans are relevant to CUP decisions). In addition, the Town of Russell passed a resolution stating, among other things, that proper cellular communications capabilities are necessary for emergency personnel, workers, visitors, residents, and economic health; that "Town of Russell residents and businesses are unserved or underserved by broadband and cellular services"; that "much of the Town is unserved by radio and cell communications of any kind"; and, as a result, that "the Town of Russell Board of Supervisors[ ] shall hereby diligently work to secure or increase cellular phone and broadband communications capabilities for unserved and underserved areas of the Town, including working to develop partnerships with telecommunications providers." Town of Russell, Wis.,

10

Resolution 16-10, *available at* Declaration of Joseph S. Diedrich, Exhibit 2 at R.76–77[2] and https://bit.ly/4hZOzoO, https://bit.ly/4nLuFyP.

Verizon Wireless provides wireless service in Bayfield County. Verizon has been experiencing a significant service gap in its network in and around the Town of Russell. Statement of Proposed Facts (SPF) ¶ 8 (R.85). Verizon customers using their devices in the gap area are likely to experience diminished call quality, slow and unreliable data transmission speeds, call drops, and blocked calls. SPF ¶ 9 (R.85; *see also* R.322–23, 341–42 (Bayfield County Highway Commissioner stating that wireless service is inadequate in area); R.306–07 (local resident stating that she lacks service in area); R.860–62 (local residents testifying about lack of wireless coverage in area); Diedrich Decl. Ex. 3 (Tr.) 66, 79–81, 84 (same)).[3] Without a new telecommunications tower, Verizon services will remain unreliable for civilian users and emergency responders. SPF ¶ 10 (R.85).

The existing service gap poses a public safety risk. Cellular connectivity is critically important for "emergency respon[ders]." Bayfield Cnty., Wis., Comp. Plan, *supra*, at 6-11; Town of Russell Res., *supra*. The Bayfield County Highway Department, for example, relies on Verizon for wireless service. SPF ¶ 11 (R.341). As the Highway Commissioner explained, the Department "has struggled with service in parts of the county for years," including in the area of the proposed tower. *Id.* (R.322; *see id.* at

---

[2] "R." citations are to the administrative record, filed as an exhibit to the Diedrich Declaration.

[3] "Tr." citations are to the transcript of the Board of Adjustment hearing, filed as an exhibit to the Diedrich Declaration. This transcript is considered part of the administrative record.

R.323 (calling the area a "dead zone")). Indeed, "highway crews regularly operate in isolated areas with limited or no cell coverage, which significantly impacts both worker safety and our ability to respond efficiently to emergencies and perform routine maintenance." *Id.* (R.323). And there have been specific instances in which the lack of coverage "delayed emergency response." *Id.* (R.323).

Nearby residents also explained that the lack of service in the area creates a public safety risk, because individuals injured in farming or motor-vehicle accidents—including in "treacherous" winter conditions—cannot reliably call for help. SPF ¶ 12 (R.304, 306, 861–62; *see* Tr. 79–81, 84). Yet as long as TowerNorth is unable to install the proposed tower, Verizon will not have the requisite equipment in place for robust network to support emergency personnel and the public safety. SPF ¶ 13 (R.74, 77, 85, 89).

### B.     To address that need, TowerNorth submits an application for a CUP for a new telecommunications tower.

To address its service gap, Verizon identified a search area in which a new telecommunications tower needs to be located. SPF ¶ 14 (R.85–86). The boundaries of the search area represent the outer limit of where a new tower could be constructed and still be effective. SPF ¶ 15 (R.84–86, 89–91). After careful investigation, Verizon identified no existing towers within the search area on which Verizon could collocate its equipment (i.e., share space on an existing tower). SPF ¶ 16 (R.73–74, 83, 86–87). As a result, Verizon hired TowerNorth to identify a property within the search area that could accommodate a new telecommunications tower. SPF ¶ 17 (R.72, 86–87; *see* Tr. 51–52, 65). Working together, Verizon and TowerNorth identified a parcel of

12

private property in the Town of Russell, on which TowerNorth proposes to construct a tower for Verizon to locate its antennas and equipment. SPF ¶ 18 (R.72–73, 86–87; *see* R.852–59 (testimony about site-selection process)). TowerNorth and the property owner entered into a lease agreement. SPF ¶ 19 (R.92–102).

The proposed tower will provide a great benefit to the community. SPF ¶ 20 (R.74). It will provide additional wireless communication services to an area that currently struggles with minimal or inconsistent coverage. *Id.* (R.74). These services will benefit residents, workers, visitors, and emergency responders. *Id.* (R.74; *see also* R.77). The Highway Commissioner confirmed that the proposed tower "absolutely will" "improve public safety" and "greatly enhance [the highway] department's operational communication during both emergency incidents and day-to-day maintenance work." SPF ¶ 21 (R.323, 341–42). Multiple members of the Planning and Zoning Committee agreed that the proposed tower is needed to address public safety concerns. SPF ¶ 22 (*see* R.917–18, 928).

Besides the services that will be provided by Verizon, the proposed tower is designed to accommodate, by collocation, at least three additional wireless carriers. SPF ¶ 23 (R.74). The tower will not require any public participation or result in any public cost. SPF ¶ 24 (R.74). In fact, the wireless communication services offered by Verizon are desired by both businesses and individuals and will be an economic asset to the community. SPF ¶ 25 (R.74). The tower's location was carefully chosen with the property owner to best conform with the current and potential future use(s) of the underlying property and to maximize the distance to the surrounding properties and

13

uses. SPF ¶ 26 (R.79). The tower will be obscured from surrounding vehicular, pedestrian, and residential viewsheds by the natural topography and existing tree cover on the subject parcel and throughout the surrounding area. SPF ¶ 27 (R.79).

On May 20, 2025, TowerNorth, through its agent Terra Consulting, submitted an application for a CUP to site and construct a new telecommunications tower in the Town of Russell in Bayfield County. SPF ¶ 35 (*see* R.63–206). The application included, among other things (SPF ¶ 36):

- An extended narrative description of the proposed tower and its compliance with federal, state, and local regulations. *See* R.72–79.

- An affidavit of a radiofrequency (RF) engineer, declaring that there are existing structures that provide a feasible collocation opportunity. R.83–84.

- A letter from an RF engineer, explaining the technological need for the new tower, R.85–87, and accompanying maps, R.88–91.

- FCC licenses for the proposed site. R.103–16.

- An FCC antenna registration. R.117–18.

- A NEPA environmental review, with a finding of no significant impact from the proposed tower. R.119–30; *see also* R.463–759.

- An FAA determination of no hazard to air navigation from the proposed tower. R.131–39.

- An engineering certification. R.140–41.

- A certificate of liability insurance. R.142.

- A site plan. R.158–204.

Bayfield County received TowerNorth's CUP application on May 20, 2025. SPF ¶ 37 (R.63). On May 30, Bayfield County requested additional information from TowerNorth. SPF ¶ 38 (R.210). On June 17, TowerNorth provided the requested

14

information. SPF ¶ 39 (R.207–14). TowerNorth's application was "deemed complete" by Bayfield County on June 20. SPF ¶ 40 (R.207).

TowerNorth later supplemented its application with a certified appraisal showing that the tower "will not measurably impact the value of surrounding properties." SPF ¶ 41 (R.760–825). Several dozen nearby residents signed a petition in support of the tower. SPF ¶ 42 (R.399–407).

### C. The Planning and Zoning Committee initially decides to approve TowerNorth's application.

On July 21, 2025, the Planning and Zoning Committee held a public hearing on TowerNorth's CUP application. SPF ¶ 42 (*see* R.833–931). At that meeting, the Committee voted to approve TowerNorth's application. SPF ¶ 43 (R.834–37).

On July 31, the Committee issued a written decision documenting its approval. SPF ¶ 44 (R.826–32). The Committee found, among other things, that:

- The proposed tower complies with applicable law.

- The proposed tower is consistent with the Bayfield County Comprehensive Plan.

- "[A]dditional cellular service in an area that does not have any service would seem to increase the safety and provide better access to emergency services."

- Evidence showed there is "a dead zone with no cellular coverage," and that the tower "will expand coverage where there is presently none," thereby "provid[ing] individuals access to emergency services."

- "The neighboring properties are predominantly used for farming and residential use[,]" and "there does not appear to be any evidence that they will not be able to carry out any activity as a result of this tower."

SPF ¶ 44 (R.826–27).

15

**D.     More than 90 days after TowerNorth's complete application was received, the Board of Adjustment denies TowerNorth's application.**

On August 19, 2025, an appeal of the Planning and Zoning Committee's decision was filed with the Board of Adjustment by "Citizens for Land Use Transparency and Integrity" ("by Esme Martinson"). SPF ¶ 45 (R.6–58). Among other things, the Citizens disputed the need for the tower and contended that it would diminish their property values. SPF ¶ 46 (*see* R.9–12).

On multiple occasions, TowerNorth warned Bayfield County and its Board of Adjustment about the federal and state shot clocks, urging prompt action and preserving its argument that the shot clock had expired. SPF ¶ 48 (*see* R.1121–25, 1099–1120, 1096–97, 1077).

On October 30, 2025, the Board of Adjustment held a public hearing and conducted de novo review of the Planning and Zoning Committee's decision. SPF ¶ 49 (R.1, 3–4, 1094. *See generally* Tr.). At that hearing, the Board voted to deny TowerNorth's CUP application. SPF ¶ 50 (Tr. 106–07).

The Board of Adjustment's oral decision at the hearing came: 163 days after TowerNorth filed its application, 132 days after Bayfield County deemed TowerNorth's application complete, and 72 days after the appeal was filed with the Board of Adjustment. SPF ¶ 51.

On November 19, 2025, the Board of Adjustment issued a written decision documenting the denial. SPF ¶ 52 (Diedrich Decl. ¶ 5, Exhibit 4). The decision was transmitted on Bayfield County letterhead, signed by the County Planning and Zoning Director. SPF ¶ 53 (Diedrich Decl. Ex. 4 at 1).

16

The Board of Adjustment's written decision at the hearing came: 183 days after TowerNorth filed its application, 152 days after Bayfield County deemed Tower-North's application complete, and 92 days after the appeal was filed with the Board of Adjustment. SPF ¶ 54.

Besides background facts, the Board of Adjustment's decision in its entirety provides the following reasons for the denial:

> That on October 30, 2025 the Board held a De Novo Review Hearing of the Committee's granting of Tower North's CUP, and made the following determinations after review of substantial evidence:
>
> a. The application or use proposed by Tower North is incompatible with the rural character and fails to preserve and protect the natural beauty and dark skies of the area, including the Apostle Islands National Lakeshore.
>
> b. The application or use proposed by Tower North would have a negative impact on the Town of Russell's economy, including but not limited to tourism and the local tax base, and would reduce property values of the real estate in the vicinity of the proposed cellular communication tower.
>
> c. The application or use proposed by Tower North is inconsistent with the Town of Russell's and Bayfield County's comprehensive plans.

SPF ¶ 55 (Diedrich Decl. Ex. 4 at 3–4).

## ARGUMENT

Bayfield County and its Board of Adjustment violated federal and state law. As a result, the Court should—immediately, at this preliminary stage—enjoin the defendants from interfering with TowerNorth's construction of the tower, order them to issue the CUP, or both. Such a remedy is commonplace in similar cases, and Tower-North satisfies the applicable test.

A party requesting preliminary injunctive relief must "establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Whole Woman's Health All. v. Hill*, 937 F.3d 864, 875 (7th Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, (2008)). The Court weighs the factors on a "sliding scale": "[T]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Cook Cnty. v. Wolf*, 962 F.3d 208, 234 (7th Cir. 2020). Here, TowerNorth has established each factor, and immediate injunctive relief is warranted.

## I.   TowerNorth is likely to succeed on the merits.

Federal and state law require local governments to make a final decision on tower applications within specified time periods. Bayfield County and its Board of Adjustment failed to do so. Controlling Wisconsin law dictates a mandatory consequence for that delay: TowerNorth's application is deemed approved by operation of law. The Court can and should decide this case in TowerNorth's favor on that basis alone.

Even if the Court reaches the substance of the denial decision, TowerNorth is still likely to succeed. Contrary to federal and state law, the denial was not supported by substantial evidence and a satisfactory explanation. First, the decision is necessarily unsupported; as multiple courts have recently held, any decision or reasoning articulated after the shot clock expires cannot be considered at all. Second, even if

18

the Court could consider the articulated reasons for the denial, the decision still flunks the substantial-evidence test.

### A. The application is "deemed approved" because no final decision was timely issued.

#### 1. Because Bayfield County did not timely issue a final decision, the application is "deemed approved."

**a.** The Wisconsin Mobile Tower Siting Law "sets forth certain actions a political subdivision must complete if it wishes to retain the ability to deny an application for a CUP." *Town of Fond du Lac*, 2025 WI App 21, ¶ 50. Called the "shot clock," the statute mandates that "[w]ithin 90 days of its receipt of a complete application, a political subdivision shall . . . [m]ake a *final decision* whether to approve or disapprove the application" and "[n]otify the applicant, in writing, of its final decision." Wis. Stat. § 66.0404(2)(d)2.–3. Plus, "[i]f the decision is to disapprove the application," the political subdivision must "include with the written notification substantial evidence which supports the decision"—also within that 90-day period. *Id.* § 66.0404(2)(d)4. If the "political subdivision" does not satisfy these requirements "[w]ithin 90 days," then "the applicant may consider the application approved." *Id.* § 66.0404(2)(d).

Here, it is undisputed that TowerNorth's "complete application" was "recei[ved]" no later than June 20, 2025. *See supra* pp. 14–15. The Wisconsin shot clock began to run that day. Wis. Stat. § 66.0404(2)(d). Ninety days later—the day the shot clock expired—was September 18, 2025. Within that 90-day shot clock, the Board of Adjustment did not "[m]ake a final decision," "[n]otify the applicant[ ] in writing," or

19

"include . . . substantial evidence which supports the decision." Wis. Stat. § 66.0404(2)(d)2.–4. The shot clock was violated.

The Mobile Tower Siting Law spells out a consequence for the shot clock violation: TowerNorth "may consider the application approved." *Id.* § 66.0404(2)(d). This means the application is "deemed approved by operation of law." *Town of Fond du Lac*, 2025 WI App 21, ¶¶ 46–47, 50. In *Town of Fond du Lac*, the political subdivision received a complete application for a CUP to construct a telecommunications tower. *Id.* ¶¶ 2, 5. Like here, the political subdivision violated the 90-day shot clock. *Id.* ¶¶ 12, 39–40. The applicant sued, seeking a declaratory judgment, which the trial court denied. *Id.* ¶ 13. On appeal, the Wisconsin Court of Appeals explained that "actual compliance" with the 90-day shot clock is "required." *Id.* ¶¶ 32–34, 50. Because the political subdivision had not complied with the shot clock, the application was "deemed approved by operation of law," and the applicant was "entitled to proceed with the activity for which it sought approval in its application." *Id.* ¶¶ 46–47, 50. The court ordered declaratory judgment in the applicant's favor. *Id.* ¶ 50. *Town of Fond du Lac* directly controls the outcome here.

The Fourth Circuit, likewise, recently ruled in an applicant's favor in a nearly identical situation under a nearly identical Virginia statute. *Tillman Infrastructure LLC v. Bd. of Supervisors of Culpeper Cnty.*, 2025 WL 2335966 (4th Cir. 2025). There, an applicant applied for a CUP to construct a telecommunications tower, which the county denied. *Id.* at *1. The applicant sued, alleging claims under the federal Telecommunications Act and Virginia state law. *Id.* at *2. Like Wisconsin, "Virginia law

20

requires localities to act on zoning applications for wireless communications towers within timelines set by statute." *Id.* Specifically, the law required local governments to "approve or disapprove" an application for a telecommunications tower "within . . . 150 days of receipt of the completed application"—and, if the local government "fails" to do so, the application "shall be deemed approved." *Id.* (quoting Va. Code Ann. § 15.2-2316.4:1(C)(2)(a), (D)). Because the local government in *Tillman* took 180 days to disapprove the application, the Court held that the application "had already been 'deemed approved' by operation of law before the Board conducted its tardy vote." *Id.* The Court affirmed the district court's grant of a declaratory judgment for the applicant. *Id.* at *3. *Tillman* underscores the correctness of TowerNorth's position here.

> **b.**       The defendants' tardy action also violated the 150-day federal shot clock.

That shot clock began to run on May 20, 2025, the day TowerNorth submitted its application. 47 C.F.R. § 1.6003(e); FCC Order ¶ 141. The shot clock was tolled for 18 days—the period of time between when Bayfield County notified TowerNorth that additional information was needed and when TowerNorth provided that information. 47 C.F.R. § 1.6003(d)(2); SPF ¶ 39 (R.207–11). Thus, the shot clock expired 168 days after TowerNorth submitted its application—on November 4. As of that date, the Board of Adjustment had not took "final action" and issued a decision "in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 337(c)(7)(B)(iii), (v). Bayfield County and its Board of Adjustment therefore violated the federal shot clock. *See New Cingular Wireless PCS, LLC v. Town of Colonie*, 2022

21

WL 1009436, at *8–9 (N.D.N.Y. 2022) (granting summary judgment injunctive relief to applicant for municipality's federal shot-clock violation).

### 2.   The Planning and Zoning Committee's interlocutory decision does not change that conclusion.

The other side will likely argue that the Planning and Zoning Committee's July 31 decision satisfied the shot clock. That argument is wrong: the Planning and Zoning Committee's decision was an interlocutory decision—not the "final decision" required by the Mobile Tower Siting Law, Wis. Stat. § 66.0404(2)(d)2., or the "final action" required by the Telecommunications Act, 47 U.S.C. § 332(c)(7)(B)(v).

**a.**    The Mobile Tower Siting Law requires the "political subdivision" to "[m]ake a *final decision* whether to approve or disapprove the application" "[w]ithin 90 days." *Id.* § 66.0404(2)(d)2. (emphasis added). A "political subdivision" is "a city, village, town, or county." *Id.* § 66.0404(1)(p). Based on this definition, the political subdivision here is Bayfield County—as a whole.[4]

Both the Planning and Zoning Committee and the Board of Adjustment are constituent *parts of* Bayfield County.[5] Under state law, the county "may"—but does

---

[4] Section 66.0404(1)(p) does not differentiate between constituent parts of a county—such as a zoning committee and board of adjustment. The legislature knows how to so differentiate when it wants to and has done so in the past. *See, e.g.*, Wis. Stat. § 781.10(1)(b) (defining "political subdivision" to include both a "county" and a "board of adjustment"). The only reasonable reading supported by both the plain text and caselaw is that the "political subdivision" here is Bayfield County as a whole, not its constituent committees or boards. *See, e.g.*, *State v. Yakich*, 2022 WI 8, ¶ 24, 400 Wis. 2d 549, 970 N.W.2d 12 (observing that the legislature "plainly demonstrated the ability" to set forth a different standard but "declined to do so").

[5] The Citizens before the Board of Adjustment agreed, referring to "the Board of Adjustment *of the County*" and admitting that the Board of Adjustment is "*part of the County*." SPF ¶ 47 (R.1080) (emphases added).

22

not have to—"create a planning and zoning committee" and a "board of adjustment." Wis. Stat. §§ 59.69(2), 59.694(1). Bayfield County chose to create both here. Bayfield Cnty., Wis., Code §§ 13-1-41(a)(2), 13-1-101A, 13-1-102, 13-1-102A. The powers, duties, and rules of the Planning and Zoning Committee and the Board of Adjustment appear in neighboring sections of the same *Bayfield County* zoning ordinance. Bayfield Cnty., Wis., Code §§ 13-1-101A, 13-1-102. The members of the Board of Adjustment are chosen by the county board. *Id.* § 59.694(2)(a). Bayfield County staff support both the Planning and Zoning Committee and the Board of Adjustment. Bayfield Cnty., Wis., Code § 13-1-102A(i).

Under Bayfield County ordinances, both the Planning and Zoning Committee and the Board of Adjustment play a role in the process for obtaining a CUP for a new telecommunications tower. The Planning and Zoning Committee reviews a CUP application, holds a public hearing, and issues a decision to grant, deny, or grant with conditions. *Id.* § 13-1-41(b)(3)–(4). If any "person aggrieved"—including a third party—appeals the Planning and Zoning Committee's CUP decision to the Board of Adjustment, that appeal "shall stay all proceedings in furtherance of the action appealed from." Wis. Stat. § 59.694(5); Bayfield Cnty., Wis., Code § 13-1-102(c)(1), (e)(1). The Board of Adjustment must hold a public hearing, can conduct de novo review, and can "reverse or affirm" the decision on appeal. Bayfield Cnty., Wis., Code § 13-1-103A(d)(2); *Osterhues*, 2005 WI 92, ¶ 2. The Board of Adjustment then issues a decision, which is considered to be a decision of county as a whole. Bayfield Cnty., Wis., Code § 13-1-102A(g)(3). Indeed, the Board of Adjustment decision here was

23

transmitted on Bayfield County letterhead, signed by the Bayfield County Planning and Zoning Director. SPF ¶ 54 (Diedrich Decl. Ex. 4 at 1). Only once the Board of Adjustment issues its decision can a person challenge it in court. *Jefferson Cnty.*, 261 Wis. at 63–64; *see also* Wis. Stat. § 59.694(10). In sum, by creating its Board of Adjustment and endowing it with the power to hear CUP appeals, Bayfield County chose to delay the issuance of any "final decision" pending the completion of the Board of Adjustment process.

All this means that here, the Board of Adjustment's decision—not the Planning and Zoning Committee's—was the "final decision" of the "political subdivision," Bayfield County. Wis. Stat. § 66.0404(2)(d)2. The Planning and Zoning Committee's decision was merely an interlocutory decision. Indeed, the Board of Adjustment on appeal exercised de novo review of the Planning and Zoning Committee's decision and reversed the prior approval. Bayfield Cnty., Wis., Code § 13-1-103A(d)(2); *Osterhues*, 2005 WI 92, ¶ 2; *see supra* Statement II.D. The appeal to the Board of Adjustment here "stay[ed] all proceedings in furtherance of the action appealed from," Wis. Stat. § 59.694(5), meaning TowerNorth could not proceed with tower construction during the appeal. And because of the Board of Adjustment appeal process, the Planning and Zoning Committee's decision was not a "final decision" for purposes of judicial review. *See Jefferson Cnty.*, 261 Wis. at 63–64 (requiring exhaustion of board-of-adjustment process before seeking judicial review); Wis. Stat. § 66.0404(2)(f) (allowing judicial

24

review only of a "final decision" of the "political subdivision"); *id.* § 59.694(10) (allowing judicial review of a "decision of the board of adjustment").[6]

Importantly, Bayfield County *chose* to create its cumbersome, time-consuming administrative-review process; it did not have to. By state law, a "county board *may* provide for the appointment of a board of adjustment." Wis. Stat. § 59.694(1) (emphasis added). So Bayfield County did not have to create the Board of Adjustment. Or, given that Bayfield County wished to create the Board of Adjustment, it could have limited the Board's powers. It could have, for instance, exempted *conditional use permit* decisions from being appealed to the Board of Adjustment (instead requiring those appeals to go directly to court), thus making the Planning and Zoning Committee's CUP decisions "final." *Id.* § 59.69(5e)(e) (allowing counties to exempt conditional use permit decisions from board of adjustment review). Or, given the 90-day shot clock for tower applications and the consequence of the shot clock's expiration, Bayfield County could have exempted CUP decisions *relating to telecommunications*

---

[6] This conclusion—that only the Board of Adjustment's decision was a "final decision"—comports with the basic administrative-law precept that an agency does not take final action until all administrative appeals have been completed. *See, e.g.*, *Bigbee v. Nalley*, 482 F. Supp. 2d 1092, 1099 (W.D. Wis. 2007) (holding that agency action is not "final" unless "an aggrieved party has exhausted all administrative remedies expressly prescribed by statute or agency rule" (quoting *Darby v. Cisneros,* 509 U.S. 137, 146 (1993)); *Kimberly Area Sch. Dist. v. Lab. & Indus. Rev. Comm'n*, 2005 WI App 262, ¶ 12, 288 Wis. 2d 542, 707 N.W.2d 872 (holding that only "final" agency action is subject to judicial review, and "interlocutory" decisions are not final); Charles H. Koch et al., 2 Admin. L. & Prac. § 5:27 (3d ed.) ("One is required to exhaust the processes below before filing an administrative appeal and only a final decision may be appealed to the administrative review authority."); 83 Am. Jur. 2d Zoning and Planning § 854 ("Property owners who are involved in a dispute with a land use regulatory agency are expected to exhaust any administrative remedies available to them before seeking intervention of the federal courts.").

*infrastructure* from being appealed to the Board of Adjustment (instead requiring those appeals to go directly to court). Despite all those options being available, Bayfield County chose otherwise.[7] That choice was Bayfield County's to make. But by making that choice, both the Planning and Zoning Committee and the Board of Adjustment had to act faster than they did here.

To avoid this conclusion, the defendants would have to argue that the Board of Adjustment is its own "political subdivision." (As explained, the Board of Adjustment is not its own "political subdivision." *See supra* pp. 22–24 & n.4.) But even if—contrary to law—the Board of Adjustment were considered to be its own "political subdivision," the Board still violated the shot clock. The Board received the appeal on August 19; 90 days later was November 17. Yet as of that date, the Board had not "[n]otif[ed] the applicant, in writing, of its final decision." Wis. Stat. § 66.0404(2)(d)3.

In sum, under Wisconsin law, Bayfield County had to—but did not—make a *final decision* within 90 days. There is no exception for pending administrative appeals, nor does the statute allow a political subdivision to extend the deadline by adding administrative-review processes. While a county can create an internal board of adjustment to hear appeals, it must ensure that its full process—from the "receipt of a complete application" through the rendering of "a final decision" *by its board of adjustment*—be complete within 90 days. Wis. Stat. § 66.0404(2)(d). Any other interpretation of Wisconsin law would incentivize local governments to create cumbersome

---

[7] The state Mobile Tower Siting Law, with its 90-day shot clock, was enacted in 2013. *See* 2013 Wis. Act 20. Bayfield County thus had over a decade to adjust its internal administrative process to conform to the shot clock's demands. It chose not to.

and time-consuming administrative appeals processes to evade the mandatory shot clock, thereby undermining the purpose of the Mobile Tower Siting Law. *See Town of Fond du Lac*, 2025 WI App 21, ¶¶ 35–36 (regarding purpose).

**b.** Federal law also treats the Planning and Zoning Committee's decision as interlocutory—not final. The federal shot clock "places an outer limit on the time that a state or local government may take to come to a 'final' decision," which necessarily includes the conclusion of any administrative appeals, *Town of Rome*, 810 F.3d at 85–86; *see also id.* (reasoning that the shot clock requires a timely "final" decision "no matter how cumbersome or streamlined a state or local government (or an instrumentality thereof) chooses to make its administrative process"); *AT&T Wireless PCS, Inc. v. Town of Porter*, 203 F. Supp. 2d 985, 989 (N.D. Ind. 2002) (holding that "final action" obtains upon the exhaustion of state-law administrative remedies). Indeed, the shot clock encompasses "all authorizations necessary for the deployment of personal wireless services infrastructure," FCC Order ¶ 132, and requires that the "*entire approval process* necessary for deployment [of infrastructure] is completed within" the shot-clock period, *id.* ¶ 135 (emphasis added); *see also id.* ¶ 136.

**B. The denial is not supported by substantial evidence.**

Under federal law, the denial had to "be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). So too under state law, it had to be "in writing" and supported by "substantial evidence." Wis. Stat. § 66.0404(2)(d)3.–4.; *id.* § 59.69(5e)(b)2. (requiring CUP denials to be "supported by substantial evidence"). Although the substantial-evidence standard allows for some deference to a local government's decision, "denials subject to the

27

[Telecommunications Act] are reviewed . . . more closely than other types of zoning decisions to which federal courts generally accord great deference." *Orange Cnty.-Poughkeepsie Ltd. P'ship v. Town of E. Fishkill*, 84 F. Supp. 3d 274, 295 (S.D.N.Y.), *aff'd sub nom. Orange Cnty.--Cnty. Poughkeepsie Ltd. P'ship v. Town of E. Fishkill*, 632 F. App'x 1 (2d Cir. 2015) (quoting *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 637 (2d Cir. 1999)).

Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera v. NLRB*, 340 U.S. 474, 477 (1951) (quotations omitted). Although not necessarily a preponderance, "more than a scintilla of evidence" is required. *Oyster Bay*, 166 F.3d at 494. "[C]ritical findings" must find "record support." *Orchard Hill Bldg. Co. v. U.S. Army Corps of Eng'rs*, 893 F.3d 1017, 1027 (7th Cir. 2018). At bottom, there must be *some evidence—* and that evidence must be *substantiated. See id.* (reversing for lack of substantial evidence, where agency failed to "substantiate its say-so [and] . . . explain why it matters"); *T-Mobile Cent., LLC v. Charter Twp. of W. Bloomfield*, 691 F.3d 794, 800 (6th Cir. 2012) ("Substantial evidence should be substantiated."); *PrimeCo Pers. Commc'ns v. City of Mequon*, 352 F.3d 1147, 1150–51 (7th Cir. 2003); *Gehin v. Wis. Grp. Ins. Bd.*, 2005 WI 16, ¶ 53, 278 Wis. 2d 111, 692 N.W.2d 572 ("[M]ere uncorroborated hearsay . . . does not constitute substantial evidence."). Substantial evidence, in the context of CUP denials, also means "facts and information, other than merely personal preferences or speculation, directly pertaining to the requirements and

28

conditions an applicant must meet to obtain a conditional use permit and that reasonable persons would accept in support of a conclusion." Wis. Stat. § 59.69(5e)(a)2.

The substantial-evidence standard also requires a local government to "provide reasons" and "articulate a satisfactory explanation for its action." *City of Roswell*, 574 U.S. at 301 (citing *State Farm*, 463 U.S. at 43).

Finally, "[a]lthough the [Telecommunications Act] specifies how much evidence must be in the record for a municipality's denial of an application for a wireless facility to be upheld, the statute supplies no substantive criteria for municipalities to apply." *Primeco Pers. Commc'ns v. City of Mequon*, 242 F. Supp. 2d 567, 575 (E.D. Wis. 2003), *aff'd sub nom. PrimeCo*, 352 F.3d 1147 (7th Cir. 2003) (citing *Oyster Bay*, 166 F.3d at 495). "Such criteria are provided by state and local law." *Id.* (citing *Oyster Bay*, 166 F.3d at 495; *Cellular Tel. Co. v. Zoning Bd. of Adjustment of the Borough of Ho–Ho–Kus,* 197 F.3d 64, 72 (3d Cir. 1999)); *see W. Bloomfield*, 691 F.3d at 801 (looking to state substantive standards). To that end, the substantive limitations found in Wisconsin's Mobile Tower Siting Law also factor into substantial-evidence review. *See supra* Statement I.B.

> **1.    The denial is not supported by substantial evidence because none of the Board of Adjustment's findings can be considered.**

At the threshold, the denial is necessarily unsupported by substantial evidence because none of the Board of Adjustment's findings or reasoning can be considered *at all*. This is so under federal and state law.

First, under federal law, the denial had to be "in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). And

it had to be "in writing" within 150 days of receiving the application, plus tolling. *Id.* § 337(c)(7); 47 C.F.R. § 1.6003(c)(iv). As explained, no decision was made in writing by November 4, the day the federal shot clock expired. *See supra* Argument I.A.1.b. Due to its untimeliness, Bayfield County and its Board of Adjustment have forfeited the right to prepare any denial "in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii); *see Town of Colonie*, 2022 WL 1009436, at *8–9 (granting summary judgment and injunctive relief to applicant for municipality's federal shot-clock violation).

Second, under state law, the denial also had to be "in writing" and supported by "substantial evidence" within 90 days of a complete application. Wis. Stat. § 66.0404(2)(d)3.–4. As explained, no decision was made—much less in writing—by September 18, the date the state shot clock expired. *See supra* Argument I.A.1.a. "[H]aving failed to provide written notification" of its decision in time, Bayfield County and its Board of Adjustment "*necessarily* failed to identify the substantial evidence it relied upon in voting to deny [TowerNorth's] application." *Town of Fond du Lac*, 2025 WI App 21, ¶ 39 (emphasis added).

The Eastern District of Wisconsin faced a similar situation—and reached the same conclusion—in *Cellco Partnership v. City of Milwaukee*, 2024 WL 329001, at *7 (E.D. Wis. 2024), *appeal dismissed*, 140 F.4th 854 (7th Cir. 2025). There, a city denied an applicant's permits within the state and federal shot clock.[8] *Id.* at *3. Later, after

---

[8] The 90-day shot clock for "small cell" telecommunications structures at issue in *City of Milwaukee* is virtually identical to the 90-day shot clock for macro-size

the shot clock expired, the city tried to supplement its denial with additional reasoning. *Id.* at \*4, \*7–8. The court rejected the city's late supplement, holding that "[a]ny justification [for denial] offered after" the shot clock's expiration "is untimely and irrelevant." *Id.* at \*7.

So too here, anything Bayfield County or its Board of Adjustment wrote after the shot clock expired cannot be considered. Of course, here—worse than in *City of Milwaukee*—Bayfield County and its Board of Adjustment "offered" *no* "justification" for denial within the shot clock; *everything* they offered came after the shot clock expired and "is untimely and irrelevant." *Id.* Accordingly, Bayfield County and its Board of Adjustment have *nothing* to rely on. Not only does their untimeliness mean the application is deemed approved (see above), but it also means the denial is unsupported by substantial evidence.

> **2.      Even if the Court were to review the denial decision, it lacks the support of substantial evidence.**

The Board of Adjustment's written decision flunks the substantial-evidence test. Aside from rote background facts, the entire rationale for denial consists of three sentences. Separately and together, these "the [three] stated reasons for denial" are "not supported by substantial evidence." *W. Bloomfield*, 691 F.3d at 805; *City of Milwaukee*, 2024 WL 329001, at \*6 (rejecting as insufficient "two fragmented sentences").

**a.**      The Board of Adjustment's first sentence states: "The application or use proposed by Tower North is incompatible with the rural character and fails to

---

telecommunications structures at issue here. *Compare* Wis. Stat. § 66.0414(3)(c)1.d., *with id.* § 66.0404(2)(d).

preserve and protect the natural beauty and dark skies of the area, including the Apostle Islands National Lakeshore." SPF ¶ 55 (Diedrich Decl. Ex. 4 at 3).

This sentence fails on its face. It cites no evidence in support and is the "exact type of conclusory statement[ ] the Seventh Circuit has explained cannot satisfy the substantial evidence standard." *City of Milwaukee*, 2024 WL 329001, at *7 (rejecting as conclusory city's decision that proposed infrastructure was "unsightly" and "out-of-character"). The sentence amounts to say-so, but the Board of Adjustment failed to "substantiate its say-so." *Orchard Hill*, 893 F.3d at 1027. "[C]onclusory statements" do not constitute substantial evidence. *NMSURF*, 2021 WL 2646754, at *5–6; *see City of Milwaukee*, 2024 WL 329001, at *6. Nor do unexplained, unsupported aesthetic concerns. *See PrimeCo*, 352 F.3d at 1150 ("It is not sufficient evidence, as the cases make clear by saying that 'generalized' aesthetic concerns do not justify the denial of a permit.").

To be sure, a few objectors at the public hearing expressed their preferences for dark skies and no towers. But those statements do not count as substantial evidence. *See* Wis. Stat. § 59.69(5e)(a)2. (defining "substantial evidence" as "facts and information, other than merely personal preferences or speculation, directly pertaining to the requirements and conditions an applicant must meet to obtain a conditional use permit and that reasonable persons would accept in support of a conclusion"); *see Orchard Hill*, 893 F.3d at 1027. If "these generalized objections sufficed," then "any wireless facility could be rejected[,]" because "[a]nyone who opposed a cell tower in their backyard could offer an excuse that it would be bad for the community, would

32

not be aesthetically pleasing, or would be otherwise objectionable." *W. Bloomfield*, 691 F.3d at 801. "[T]hat by itself is not enough. There must be evidence. And not just any evidence—evidence that is *substantial*. And substantial evidence must be substantiated by something." *Id.*; *see also Vertex Tower Assets, LLC v. Town of Canton*, 731 F. Supp. 3d 174, 192 (D. Mass. 2024) ("Even though the ZBA is a political body with open public meetings, the fact that members of the public oppose a cell tower does not constitute 'substantial evidence.'").

Although the Board of Adjustment's decision neither explains this nor cites evidence in support, the concern about "natural beauty and dark skies" might relate to the tower's lighting. But a political subdivision "may not" "[d]isapprove an application based solely on the height of the mobile service support structure or on whether the structure requires lighting." Wis. Stat. § 66.0404(4)(L). In addition, a political subdivision "may not" "[l]imit the height of a mobile service support structure to under 200 feet." Wis. Stat. § 66.0404(4)(u). The tower here is over 200 feet. And when a tower is over 200 feet, federal law *requires* it to be lighted for air navigation safety. Specifically, the FCC requires certain towers be illuminated, *see* 47 U.S.C. § 303(q); 47 C.F.R. §§ 17.2117.58, and mandates that towers comply with standards set forth by the Federal Aviation Administration (FAA), 47 C.F.R. §§ 17.21(a), 17.23; *e.g.*, U.S. DOT, AC 70/7460-1M, *Advisory Circular: Obstruction Marking and Lighting* (Nov. 16, 2020), https://bit.ly/3wAbuRS. The FAA standards apply to all towers over 200 feet, including TowerNorth's proposed tower and require it to be illuminated with

33

lights of a specific type, color, flashing frequency, placement, and brightness. Tower-North is bound by these federal lighting standards.

What's more, the Board of Adjustment's sentence "makes little sense" in light of other evidence. *City of Milwaukee*, 2024 WL 329001, *6. Although there were no existing towers close enough for Verizon to collocate, the record shows that several other towers exist in the broader area—including some closer to the lakeshore and at least one on Madeline Island itself. SPF ¶ 16 (R.73–74, 83, 86–87). These existing towers affect "natural beauty" and "dark skies" just as much, yet the Board of Adjustment never mentioned them or explained how denying TowerNorth's application would be non-arbitrary. The Board of Adjustment's aesthetics justification, in short, is "hard to square with the record." *City of Milwaukee*, 2024 WL 329001, *6.

Finally, the most relevant caselaw supports TowerNorth. In *City of Milwaukee*, a city denied permits to build cellular infrastructure, claiming the infrastructure was "unsightly" and "out-of-character." 2024 WL 329001, *7. The Eastern District of Wisconsin held that the city's denial was unsupported by substantial evidence because the city's decision lacked sufficient explanation—consisting only of "two fragmented sentences"—and because the record failed to support the city's finding. *Id.* at *6–7. Similarly in *Primeco*, the same district court (affirmed by the Seventh Circuit) rejected an aesthetics-based denial for a tower, even though the local government held two public hearings and presented evidence from a consulting firm regarding the tower's suitability. *Primeco*, 242 F. Supp. 2d at 571, 578; *PrimeCo*, 352 F.3d at 1147–51.

34

In *VoiceStream Minneapolis, Inc. v. St. Croix County*, by contrast, the Seventh Circuit held that a county lawfully denied a permit for a tower based in part on aesthetics. 342 F.3d 818 (7th Cir. 2003). In its denial decision, the county meticulously explained the underlying rationale for its aesthetics finding, citing specific evidence it relied on in support. *Id.* at 828. Similarly in *Helcher*, the Seventh Circuit affirmed a county's denial of a tower for aesthetic reasons. 595 F.3d at 724–25. The county's decision "clearly delineate[d] the issues that arose with the application, the evidence that was presented by both the applicants and by the residents to the Zoning Board, the concerns of the applicants and residents of the area, and the concerns of the Board members"; it also "cite[d] the specific provisions of the Ordinance that the majority of the voting members found were not met." *Id.* at 722.

The situation here more closely resembles *City of Milwaukee* and *Primeco* than *VoiceStream* or *Helcher*. Like in the former cases, the Board of Adjustment here failed to satisfactorily explain in its decision what evidence it was relying on or how that evidence supported its conclusion. The Board's unexplained and unsupported decision is a far cry from *VoiceStream* and *Helcher*, which featured decisions with significant explanation connecting the facts found to mountains of substantiated evidence.

**b.**     The Board of Adjustment's second sentence states: "The application or use proposed by Tower North would have a negative impact on the Town of Russell's economy, including but not limited to tourism and the local tax base, and would reduce property values of the real estate in the vicinity of the proposed cellular communication tower." SPF ¶ 55 (Diedrich Decl. Ex. 4 at 3).

35

Like the first sentence, this sentence also fails on its face. It cites no evidence in support. It does not explain—to even a rudimentary level of specificity—*how* the proposed tower would negatively impact the Town's economy or reduce property values. This alone renders the sentence insufficient, as the Board "did not give [Tower-North] even a basic explanation . . . that was tied to anything in the record," *City of Milwaukee*, 2024 WL 329001, at *6, and did not "articulate a satisfactory explanation for [its] action," *City of Roswell*, 574 U.S. at 301 (citation omitted); *see Orchard Hill*, 893 F.3d at 1027; *City of Milwaukee*, 2024 WL 329001, at *6; *NMSURF*, 2021 WL 2646754, at *5–6.

Regarding the "negative impact on the Town of Russell's economy, including but not limited to tourism and the local tax base," it is impossible to know what evidence the Board of Adjustment was relying on—because it cites none. But at the hearing, apart from Board members themselves, the only mention of such an issue was by Esme Martinson. She stated that "[a] 299-foot lattice-style tower placed in a scenic or residential area stands in stark contrast to the County's stated goals of preserving its rustic environment and protecting its tourism-based economy." SPF ¶ 56 (Tr. 31). But that statement is mere speculation—not substantial evidence. *See* Wis. Stat. § 59.69(5e)(a)2.

Just as importantly, the notion that the tower will negatively impact the Town of Russell's tourism economy *directly contradicts* the Town's official findings in its resolution. According to the Town, "broadband and cellular capabilities are required to increase tourism, and the number-of nights stayed at campgrounds and hotels in

36

the Town." Town of Russell Res., *supra.* "[T]he Town of Russell residents and businesses are unserved or underserved by broadband and cellular services." *Id.* The Bayfield County Comprehensive Plan agrees that coverage gaps have "been a point of frustration with residents *and visitors* throughout the County." Bayfield Cnty., Wis., Comp. Plan, *supra,* at 4-6 (emphasis added). Cellular connectivity, the County found, provides a "direct benefit to residents" and "industry." *Id.* at 6-11. The Board of Adjustment wholly ignored the Town's resolution and the comprehensive plans in this regard.

Next, consider the claim that the tower "would reduce property values of the real estate in the vicinity of the proposed cellular communication tower." This "critical finding[ ]" lacks "record support," *Orchard Hill*, 893 F.3d at 1027, as *no* substantial evidence in the record shows that the tower would reduce property values "in the vicinity." Public comments at the hearing do not constitute substantial evidence because they are speculative and uncorroborated. Wis. Stat. § 59.69(5e)(a)2.; *see Consol. Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 230 (1938) ("Mere uncorroborated hearsay or rumor does not constitute substantial evidence."). Nor does the Citizens' "letter report" from Real Estate Dynamics supply substantial evidence regarding property values "in the vicinity of" the tower. SPF ¶ 58 (R.1126–31). To the contrary, that report mentions a series of academic articles about property values in faraway places like New Zealand, South Africa, and Florida. *Id.* (R.1127–29). Regardless of what those articles say, the report's summary of them at most shows towers *can* negatively impact property values in *some* places at *some* times—not that the proposed tower

37

here "would" reduce property values "in the vicinity." Indeed, the letter report's authors admit that they "have not valued the Pearson property [at issue]." *Id.* (R.1129). The report does not conduct any comparable-sales analysis or perform any valuation based on recognized appraisal techniques—much less a valuation specific to Bayfield County or northwestern Wisconsin. *Id.* (R.1126–31). Instead, the report "hypothesize[s]" and "suspect[s]" things. *Id.* (R.1128–29). That is just more speculation—not substantial evidence.

In fact, the *only* evidence actually addressing the proposed tower's effect on "properties in the vicinity" is TowerNorth's certified appraiser's report concluding that "[t]he proposed cell tower development will not measurably impact the value of surrounding properties." SPF ¶ 41 (R.765). Unlike the Citizens' letter report, TowerNorth's appraisal used a recognized appraisal technique—a "paired sales analysis of single-family homes located near cell towers in the local area"—to reach a conclusion about the value of property actually *in the vicinity of* the proposed tower. SPF ¶ 57 (R.770, 805; *see* R.781–805). The Board of Adjustment's conclusion about property values "in the vicinity of" the tower, in sum, "run[s] counter to the evidence"—indeed, counter to the *only* substantial evidence on that issue. *State Farm*, 463 U.S. at 43.

Even if members of the Board of Adjustment were unpersuaded by TowerNorth's appraisal, the Board's decision still flunks the substantial-evidence test. The Board's decision had to—but did not—"take into account whatever in the record fairly detracts from" its favored conclusion and explain why it found other evidence more credible. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *City of Roswell*,

574 U.S. at 301.[9] While the Board can weigh competing evidence, when significant evidence supports a different conclusion, the Board must at least explain why it gave that evidence lesser weight. By ignoring evidence it didn't like, without explanation, the Board of Adjustment failed the substantial-evidence test. *See City of Roswell*, 574 U.S. at 301; *Universal Camera*, 340 U.S. at 488; *Genuine Parts Co. v. EPA*, 890 F.3d 304, 346 (D.C. Cir. 2018) (administrative decision cannot rely on a "clipped view of the record" to support conclusion).

**c.** The Board of Adjustment's third and final sentence reads, in its entirety: "The application or use proposed by Tower North is inconsistent with the Town of Russell's and Bayfield County's comprehensive plans." SPF ¶ 55 (Diedrich Decl. Ex. 4 at 4).

This sentence yet again fails on its face. It cites no evidence in support. It does not explain—to any level of specificity—*how* the proposed tower is inconsistent with either comprehensive plan. This alone defeats the sentence, as the Board "did not give [TowerNorth] even a basic explanation . . . that was tied to anything in the record," *City of Milwaukee*, 2024 WL 329001, at *6, and did not "articulate a satisfactory explanation for [its] action," *City of Roswell*, 574 U.S. at 301 (citation omitted).

Instead, this sentence merely parrots the language of the Zoning Ordinance's factors for evaluating CUP applications, without adding any substance. Bayfield Cnty., Wis., Code § 13-1-41(c)(2), (4). But "[m]erely repeating an ordinance does not

---

[9] *See also Am. Textile Mfr. Inst., Inc. v. Donovan*, 452 U.S. 490, 523 (1981) (explaining that a "reviewing court must take into account contradictory evidence in the record").

constitute substantial evidence." *W. Bloomfield*, 691 F.3d at 800. The Board of Adjustment failed to "substantiate its say-so," *Orchard Hill*, 893 F.3d at 1027, and its "conclusory statements" do not constitute substantial evidence. *NMSURF*, 2021 WL 2646754, at \*5–6; *see City of Milwaukee*, 2024 WL 329001, at \*6.

This sentence further fails the substantial-evidence test because it "run[s] counter to the evidence." *State Farm*, 463 U.S. at 43. Both the Bayfield County Comprehensive Plan and the Town of Russell Comprehensive Plan—together with evidence presented—support the proposed tower. As mentioned, the Bayfield County Comprehensive Plan identifies a "[n]eed for better infrastructure, particularly cell phone and broadband internet connections." Bayfield Cnty., Wis., Comp. Plan, *supra*, at 1, 1-4; *see supra* Statement II.A. The Town of Russell Comprehensive Plan likewise expressly aims to "continue to develop better communications," including "cellular," and to "[e]ncourage telecommunications companies to provide further services for current and future residents and businesses." Town of Russell, Wis., Comp. Plan, *supra*, at 6, 8, 10; *see also* Town of Russell Res., *supra*; *see supra* Statement II.A.

Significant evidence in the record shows that the proposed tower will be consistent with these objectives identified in the comprehensive plans. *See supra* Statement II.A, II.B. By ignoring evidence it didn't like, without explanation, the Board of Adjustment failed the substantial-evidence test. *See City of Roswell*, 574 U.S. at 301; *Universal Camera*, 340 U.S. at 488; *Genuine Parts*, 890 F.3d at 346.

**d.**    Now in litigation, the Board of Adjustment is bound by—and limited to—what its decision actually says. The Board's "*decision*"—not after-the-fact

lawyering—"must 'describe the reasons for the denial and contain a sufficient explanation of those reasons.'" *City of Milwaukee*, 2024 WL 329001, at *6 (quoting *Helcher v. Dearborn Cnty.*, 595 F.3d 710, 718 (7th Cir. 2010)) (emphasis added); *see id.* ("[T]he TCA requires that the denial be in writing and supported by a written record; it cannot be a perfunctory or conclusory denial to be filled in after-the-fact if challenged."). Substantial evidence "does not mean municipal authorities" can "cobble together a justification to support the denial" after the fact. *City of Milwaukee*, 2024 WL 329001, at *5. The defendants cannot offering *post hoc* justifications or beef up existing justifications—especially when they've far exceeded the legally allowed time period for issuing a decision in the first place. *See also Nat'l Tower, LLC v. Plainville Zoning Bd.*, 297 F.3d 14, 22 (1st Cir. 2002) (holding that it would "not uphold a board's denial of a permit on grounds that it did not present in its written decision").

\*   \*   \*

The Board of Adjustment's decision comprises "conclusory statements insufficiently buttressed by generalized notions offered by poorly qualified witnesses"—and nothing more. *Ogden Fire Co. No. 1 v. Upper Chichester TP.*, 504 F.3d 370, 389 (3d Cir. 2007). It cannot stand.

## II.    TowerNorth is entitled to an injunction.

TowerNorth seeks declaratory and injunctive relief—either prohibitory or mandatory, depending on which merits arguments the Court agrees with. Courts routinely grant injunctive relief in cases such as this one. And courts often grant *preliminary* injunctions in similar cases—or they convert the preliminary proceeding into a final trial under Rule 62(a)(2), so as to comport with Congress's directive to "hear and

41

decide such [cases] on an expedited basis." 47 U.S.C. § 337(c)(7)(B)(v). In addition to TowerNorth's clear likelihood of success on the merits, it also satisfies the other factors for injunctive relief.

### A.    TowerNorth seeks prohibitory or mandatory injunctive relief, depending on which merits arguments the Court agrees with.

Injunctions come in two forms: prohibitory and mandatory. A prohibitory injunction "forbids or restrains an act"; a mandatory injunction "compels a party to do some act or mandates a specified course of conduct." *Injunction*, Black's Law Dictionary (12th ed. 2024). Although requests for mandatory preliminary injunctions are "cautiously viewed," the applicable legal test remains the same. *See, e.g.*, *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (citation omitted).

If the Court agrees that the defendants violated the Wisconsin state shot clock, then the corresponding injunctive relief is prohibitory. When a political subdivision violates the state shot clock, "the applicant may consider the application approved," Wis. Stat. § 66.0404(2)(d)4, which Wisconsin courts have interpreted to mean that an application is "deemed approved by operation of law," *Town of Fond du Lac*, 2025 WI App 21, ¶¶ 46–47, 50. Under this self-executing mandate, the status quo is that TowerNorth's CUP application is *currently* approved. Accordingly, TowerNorth seeks prohibitory relief enjoining Bayfield County and its Board of Adjustment from interfering with TowerNorth's "entitle[ment] to proceed with the activity for which it sought approval in its application." *Id.* ¶¶ 46–47, 50.

If the Court agrees that the defendants violated the federal Telecommunications Act—either by violating the federal shot clock or by failing to support the denial

42

decision with substantial evidence—then the corresponding injunctive relief is mandatory. Unlike the Wisconsin Mobile Tower Siting Law, the Telecommunications Act does not specify a consequence for violation. Yet as explained immediately below, the typical remedy for such a violation is a mandatory injunction ordering the local government to issue the permits sought. Accordingly, TowerNorth seeks mandatory relief enjoining the defendants to issue all necessary permits to allow TowerNorth to proceed with construction of the proposed tower.

Either way, TowerNorth seeks injunctive relief that would allow it to proceed with construction of the proposed tower.

### B.    Injunctive relief is the typical remedy in cases like this one.

Although the federal Telecommunications Act does not specify a remedy, caselaw confirms that when a local government violates the Act, "courts have held that the appropriate remedy is an order to issue the relevant permit" and that "no useful purpose would be served by remanding for further proceedings." *Primeco*, 242 F. Supp. 2d at 582. "Most courts," indeed, "have held" as much. *City of Milwaukee*, 2024 WL 329001, at *10; *accord Upstate Cellular Network v. City of Auburn*, 257 F. Supp. 3d 309, 317 (N.D.N.Y. 2017) ("Courts have consistently held that a mandatory injunction is an appropriate remedy for violations of the [Telecommunications Act]." (citation modified)).[10]

---

[10] *Accord Tennessee ex rel. Wireless Income Props., LLC v. City of Chattanooga*, 403 F.3d 392, 399 (6th Cir. 2005) ("[W]e have repeatedly concluded that where the defendant denied a permit application, and that denial violated the TCA's 'in writing' and 'substantial evidence' requirements, the proper remedy is injunctive relief compelling the defendant to issue the requested permit."); *Preferred Sites, LLC v. Troup Cnty.*, 296 F.3d 1210, 1221–22 & n.12 (11th Cir. 2002) (collecting cases); *Nextel*

Wisconsin law goes further and actually specifies a remedy. If the political subdivision fails to meet the shot clock or to include "substantial evidence which supports [its] decision," then "the applicant may consider the application approved," Wis. Stat. § 66.0404(2)(d)4, which Wisconsin courts have interpreted to mean that an application is "deemed approved by operation of law," *Town of Fond du Lac*, 2025 WI App 21, ¶¶ 46–47, 50.

To those ends, injunctive relief is especially appropriate here. "Defendants are well aware of their responsibilities and obligations under the [Telecommunications Act] and [Wisconsin] State law, yet they have willfully disregarded the law and wrongfully delayed action on [TowerNorth's] application." *Town of Irondequoit*, 848 F. Supp. 2d at 403; *see* SPF ¶ 48 (R.1121–25, 1099–1120, 1096–97, 1077) (informing the defendants of shot-clock obligations). Any "further review by Defendants would serve no useful purpose and would greatly prejudice [Tower North] by encouraging additional delay in its ability to provide service to the public." *Id.*

### C.    Injunctive relief is warranted now.

Not only is injunctive relief the appropriate remedy, but courts routinely grant *preliminary* injunctions in cases like this one. *See, e.g.*, *Extenet Sys., LLC v. Vill. of*

---

*Partners, Inc. v. Kingston Twp.*, 286 F.3d 687, 695 n.6 (3d Cir. 2002) (collecting cases); *Brehmer v. Plan. Bd. of Town of Wellfleet*, 238 F.3d 117, 120–21 (1st Cir. 2001); *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp.*, 181 F.3d 403, 410 (3d Cir. 1999); *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 497 (2d Cir. 1999); *AT & T Mobility Servs., LLC v. Vill. of Corrales*, 127 F. Supp. 3d 1169, 1175–76 (D.N.M. 2015), *aff'd*, 642 F. App'x 886 (10th Cir. 2016); *Bell Atl. Mobile of Rochester L.P. v. Town of Irondequoit*, 848 F. Supp. 2d 391, 403 (W.D.N.Y. 2012); *USOC of Greater Iowa, Inc. v. City of Bellevue*, 279 F. Supp. 2d 1080, 1084 (D. Neb. 2003); *Puerto Rico Tel. Co. v. Municipality of Aguada*, 2025 WL 1906724, at *2 (D.P.R. 2025).

44

*Kings Point*, 2022 WL 1749200, at \*20 (E.D.N.Y. May 31, 2022), *aff'd sub nom. Extenet Sys., LLC. v. Vill. of Kings Point*, 2023 WL 4044076 (2d Cir. June 16, 2023) (granting preliminary injunction ordering local government to issue requested permits for telecommunications facilities).[11]

Preliminary injunctions fulfill Congress's intent that action on applications be timely and that courts "hear and decide" Telecommunications Act cases on an "expedited basis." 47 U.S.C. § 332(c)(7)(B)(v); *see Primeco*, 242 F. Supp. 2d at 582; *see also* FCC Order ¶ 120 ("As courts have concluded, preliminary and permanent injunctions fulfill Congressional intent that action on applications be timely and that courts consider violations of Section 332(c)(7)(B) on an expedited basis."). By contrast, "allowing the denial to stand"—even temporarily—"would be inconsistent with the policies underlying the 1996 Act—i.e., insuring the speedy deployment of wireless services to the public which undoubtedly benefits from such technology." *Mills*, 65 F. Supp. 2d at 160–61.

Alternatively, the Court could convert the preliminary-injunction proceedings to an expedited final trial on the merits. Fed. R. Civ. P. 65(a)(2). Federal law expressly directs review on an "expedited basis." 47 U.S.C. § 332(c)(7)(B)(v). Propelled by that directive, multiple courts have gone from complaint through final order in as little as

---

[11] *Accord NMSURF, Inc. v. State of N.M. Dep't of Transp.*, 2021 WL 2646754, at \*9 (D.N.M. 2021); *T-Mobile Ne. LLC v. City of Lawrence*, 755 F. Supp. 2d 286, 292–93 (D. Mass. 2010); *Indep. Wireless One Corp. v. Town of Charlotte*, 242 F. Supp. 2d 409, 423–24 (D. Vt. 2003); *Telecorp Realty, LLC v. Town of Edgartown*, 81 F. Supp. 2d 257, 261 (D. Mass. 2000); *Sprint Spectrum, L.P. v. Mills*, 65 F. Supp. 2d 148 (S.D.N.Y. 1999); *AT & T Commc'ns of Sw., Inc. v. City of Dallas*, 8 F. Supp. 2d 582, 595 (N.D. Tex. 1998); FCC Order ¶ 120.

five weeks. *See Iowa Wireless Servs., L.P. v. City of Moline, Ill.*, 29 F. Supp. 2d 915 (C.D. Ill. 1998); *see also BellSouth Mobility Inc. v. Gwinnett Cnty., Ga.*, 944 F. Supp. 923 (N.D. Ga. 1996).

The Eastern District of Wisconsin recently did just that. After a city denied permits to build new telecommunications towers, an applicant sued under the Telecommunications Act and state law, and sought a preliminary injunction. *City of Milwaukee*, 2024 WL 329001, at *1. The Court converted the preliminary-injunction hearing to a final trial on the merits under Federal Rule of Civil Procedure 65(a)(2). *Id.* at *11; *see also USOC of Greater Iowa, Inc. v. City of Bellevue, Nebraska*, 279 F. Supp. 2d 1080, 1084 (D. Neb. 2003) (similar).

This move would be especially appropriate in a case like this one, where the merits issues are resolved solely on the administrative record, which is before the Court in its entirety. *See* 47 U.S.C. § 332(c)(7)(B)(ii), (v) (explaining that local government decisions must be "supported by substantial evidence contained in a written record," and authorizing judicial review of such decisions); *see City of Rancho Palos Verdes*, 544 U.S. at 128 (Breyer, J., concurring) ("The phrase 'substantial evidence contained in a written record' is the traditional standard used for judicial review of agency actions.") (citation omitted). Because it is an action for review on an administrative record, this case is exempt from Rule 26 initial disclosures. Fed. R. Civ. P. 26(a)(1)(B)(i). And like the typical action for review on an administrative record, this case requires no discovery at all.

46

Regardless of whether relief is preliminary or final, it should come promptly. Congress directed court to "hear and decide" Telecommunications Act cases on an "expedited basis." 47 U.S.C. § 337(c)(7)(B)(v). Even more than others, this case warrants expedited treatment: as explained, a core part of the defendants' unlawful conduct was *delay*. Drawing out judicial proceedings would only compound that unlawful conduct.

### D.  Without an injunction, TowerNorth will suffer irreparable harm.

TowerNorth will likely suffer irreparable harm in the absence of injunctive relief for several reasons.

*First*, there is no adequate remedy at law. The denial "cannot be compensated after the fact by monetary damages." *NMSURF*, 2021 WL 2646754, at *7 (citing *City of Rancho Palos Verdes*, 544 U.S. at 122–23); *accord Extenet,* 2022 WL 1749200, at *12–13; *see also* FCC Order ¶ 123 (explaining that "no adequate remedy at law" exists "because applicants have a federal statutory right to participate in a local personal wireless services market free from municipally-imposed barriers to entry, and money damages cannot directly substitute for this right" (citation modified)).

*Second*, delay itself causes irreparable harm. As explained, a core purpose of both Telecommunications Act and the Mobile Tower Siting Law is to foster the speedy deployment of wireless infrastructure. *See supra* Statement I.A, I.B; *see infra* Argument II.F. Bayfield County and its Board of Adjustment violated those laws and frustrated their purpose by, among other things, failing to act promptly. "In today's quickly advancing world of telecommunications services, the costs of delay cannot be

47

understated." *Town of Edgartown*, 81 F. Supp. 2d at 261. As a result, TowerNorth "has suffered, and will continue to suffer an indeterminate harm from being delayed and prevented by the [defendants] from installing its wireless facilities, which harm cannot be accurately remedied through money damages." *Extenet*, 2022 WL 1749200, at *12. Indeed, "allowing the denial to stand would be inconsistent with the policies underlying the 1996 Act—i.e., insuring the speedy deployment of wireless services to the public which undoubtedly benefits from such technology." *Mills*, 65 F. Supp. 2d at 160–61 (finding policy of Telecommunications Act relevant to irreparable harm); *accord Extenet*, 2022 WL 1749200, at *12; *Town of Irondequoit*, 848 F. Supp. 2d at 403 ("Defendants are well aware of their responsibilities and obligations under the TCA and New York State law, yet they have willfully disregarded the law and wrongfully delayed action on Verizon's application. In this case, further review by Defendants would serve no useful purpose and would greatly prejudice Verizon by encouraging additional delay in its ability to provide service to the public in a non-covered area. A mandatory injunction is therefore an appropriate remedy.").

Relatedly, because of the shot-clock violation, TowerNorth is entitled to "consider its application approved." Wis. Stat. § 66.0404(2)(d); *Town of Fond du Lac*, 2025 WI App 21, ¶¶ 46–47, 50. But if TowerNorth actually were to proceed on that "consideration" and commence construction, it would expose itself to significant risk. Without a court order confirming that its application is "deemed approved by operation of law," *id.*, TowerNorth could be subject to penalties of thousands of dollars, *see*

48

Bayfield Cnty., Wis., Code § 13-1-103(c), (d); *see City of Dallas*, 8 F. Supp. 2d at 594–95 (finding potential penalty exposure relevant to irreparable-harm analysis).

*Third*, "[i]f the preliminary injunction is not issued," TowerNorth "will suffer unquantifiable and irreparable harm in the form of" "loss of the ability to compete," "loss of goodwill," and "damage to its reputation." *Town of Charlotte*, 242 F. Supp. 2d at 424. As things stand, TowerNorth and Verizon are unable to provide adequate coverage to customers and emergency responders in the service gap area. *See supra* Statement II.A; *see infra* Argument II.F. Where a provider "show[s] that" the applied-for infrastructure is "crucial to its ability to provide adequate coverage to subscribers in the . . . area, it has shown a probability of immediate irreparable harm if it is not able to install its facilities." *Cox Commc'ns PCS, L.P. v. City of San Marcos*, 204 F. Supp. 2d 1260, 1263–64 (S.D. Cal. 2002); *see also Qwest Commc'ns Corp. v. City of Berkeley*, 146 F. Supp. 2d 1081, 1103 (N.D. Cal. 2001) (similar); *Town of Charlotte*, 242 F. Supp. 2d at 423–24 (similar). TowerNorth, moreover, operates in a highly competitive industry that seeks both to provide infrastructure-deployment services to carriers like Verizon and, ultimately, to provide adequate wireless service to consumers and emergency personnel. SPF ¶ 28 (Declaration of Bert Stern ¶ 4). The delay and the denial at issue here will cause TowerNorth to lose business opportunities to other infrastructure developers. SPF ¶ 29 (Stern Decl. ¶ 5); *see Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 441 (5th Cir. 2023) ("Crown Castle will suffer irreparable harm if it cannot build its network under its contract with T-Mobile."); *Town of Edgartown*, 81 F. Supp. 2d at 261 (declaring that "[e]very day that Plaintiff's

49

special permit is denied is a day Plaintiff loses against its major competitors"). It will also cause TowerNorth's customer, Verizon, to likely suffer a loss of existing customers and the inability to attract new customers. SPF ¶ 30 (Stern Decl. ¶ 6); *see Town of Charlotte*, 242 F. Supp. 2d at 423–24 (finding similar concerns supported preliminary injunction); *City of Dallas*, 8 F. Supp. 2d at 594 (similar). This likely loss of business would be difficult, if not impossible, to quantify in monetary terms. SPF ¶ 31 (Stern Decl. ¶ 7). TowerNorth and its customer, Verizon, will also likely suffer a loss of good will and damage to their reputations. SPF ¶ 32 (Stern Decl. ¶ 8). Assigning a monetary value to this reputational harm would be difficult, if not impossible. SPF ¶ 33 (Stern Decl. ¶ 9). "[I]it is well established that the loss of goodwill and reputation" can constitute irreparable harm. *Life Spine Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021). On this basis, courts have repeatedly found irreparable harm in Telecommunications Act cases. *See City of Milwaukee*, 2024 WL 329001, at *11 (finding that "Verizon has demonstrated it would suffer irreparable reputational harm if unable to provide appropriate connectivity"); *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996) ("[T]he petitioners' potential loss of consumer goodwill qualifies as irreparable harm."); *Town of Charlotte*, 242 F. Supp. 2d at 423–24 (similar).

*Fourth and finally*, injunctive relief—whether preliminary or permanent—is appropriate, because the alternative (remand to Bayfield County) would only compound the law-violating delay present here. FCC Order ¶ 123. That is why "courts have held that the appropriate remedy is an order to issue the relevant permit" and that "no useful purpose would be served by remanding for further proceedings."

*Primeco*, 242 F. Supp. 2d at 582; *Town of Colonie*, 2022 WL 1009436, at \*8 ("Plaintiff faces continuing irreparable harm if relief is not granted because remand to the Town would serve no useful purpose and would further delay Plaintiff's ability to provide personal wireless services in the area where the deployment is proposed."); *see supra* Statement I.A; *see infra* Argument II.F.

**E.     The balance of the equities weighs in TowerNorth's favor.**

In addition, "the balance of equities tips in [TowerNorth's] favor." *Hill*, 937 F.3d at 875.

As explained above and below, TowerNorth will suffer irreparable harm without injunctive relief, and an injunction would serve the public interest. By contrast, Bayfield County and its Board of Adjustment will not suffer harm—especially irreparable harm—if the proposed tower is installed. *See Town of Edgartown*, 81 F. Supp. 2d at 261; *NMSURF*, 2021 WL 2646754, at \*8. Indeed, "the only right of which" the defendants "would be deprived by a preliminary or permanent injunction is the right to act on the siting application beyond a reasonable time period." FCC Order ¶ 123. But such a "right" "is not legally cognizable, because under [§ 332(c)(7)(B)(ii)], the [defendants have] no right to exercise this power." *Id.* (quoting *New Jersey Payphone Ass'n, Inc. v. Town of W. New York*, 130 F. Supp. 2d 631, 641 (D.N.J. 2001), *aff'd*, 299 F.3d 235 (3d Cir. 2002)). Further, the proposed tower, once built, can be completely removed. SPF ¶ 34 (R.849). If it is later determined on final judgment or appeal that a denial was lawful, TowerNorth can remove the tower and restore the land to its prior state. *Id.*; *see Town of Edgartown*, 81 F. Supp. 2d at 261 ("Plaintiff recognizes its obligation to remove its antennae from the Tower if it ultimately loses this case.").

F.      An injunction will serve the public interest.

Finally, "an injunction is in the public interest" for several reasons. *Hill*, 937 F.3d at 875.

*First*, a preliminary injunction would serve the public interest by improving wireless coverage. "[M]odern cell phones" are "a pervasive and insistent part of daily life," and "a significant majority of American adults now own such phones." *Riley v. California*, 573 U.S. 373, 385 (2014). Courts have recognized that "proper connectivity would clearly benefit consumers," *City of Milwaukee*, 2024 WL 329001, at *11, and that "access to wireless services is beneficial to the community at large" and serves the public interest, *NMSURF*, 2021 WL 2646754, at *8; FCC Order ¶¶ 1–2, 23–24; *see also New Cingular Wireless PCS, LLC v. Town of Greenfield*, 2010 WL 3528830, at *5 (D.N.H. 2010) ("[E]nhanced cellular telephone service" is "decidedly in the public interest."). To that end, it is also "in the public interest to deploy the facility"—the proposed tower—"as soon as possible to improve wireless services." *Town of Colonie*, 2022 WL 1009436, at *8 (N.D.N.Y. 2022). All together, "the importance of building out our nation's telecommunications network demonstrate[s] that [an] injunction is in the public interest." *City of Pasadena*, 76 F.4th at 441

Both Bayfield County and the Town of Russell have declared, through official policies, that improved wireless coverage is necessary and in the public interest. The Bayfield County Comprehensive Plan identified a "[n]eed for better infrastructure, particularly cell phone and broadband internet connections." Bayfield Cnty., Wis., Comp. Plan, *supra*, at 1-4. The persistence of "several dead areas" "that do not have cellular coverage" have "been a point of frustration with residents and visitors

52

throughout the County." *Id.* at 4-6. Because cellular connectivity provides a "direct benefit to residents," "industry," and "emergency respon[ders]," *id.* at 6-11, "access to wireless communication facilities is becoming more and more important," and the "future siting of these facilities is done so in the best interest of the County and its residents," *id.* at 4-26–4-27.

The Town of Russell Comprehensive Plan, for its part, aims to "continue to develop better communications," including "cellular," and to "[e]ncourage telecommunications companies to provide further services for current and future residents and businesses." Town of Russell, Wis., Comp. Plan, *supra*, at 6, 8, 10. In addition, the Town of Russell passed a resolution stating that proper cellular communications capabilities are necessary for emergency personnel, workers, visitors, residents, and economic health; that "Town of Russell residents and businesses are unserved or underserved by broadband and cellular services"; that "much of the Town is unserved by radio and cell communications of any kind"; and, as a result, that "the Town of Russell Board of Supervisors[ ] shall hereby diligently work to secure or increase cellular phone and broadband communications capabilities for unserved and underserved areas of the Town, including working to develop partnerships with telecommunications providers." Town of Russell Res., *supra*.

Consistent with those policy statements, the record here establishes that the area TowerNorth seeks to serve suffers from poor wireless coverage. SPF ¶ 8 (R.85). Verizon customers using their devices in the gap area are likely to experience diminished call quality, slow and unreliable data transmission speeds, call drops, and

53

blocked calls. SPF ¶ 9 (R.322–23, 341–42 (Bayfield County Highway Commissioner stating that wireless service is inadequate in area); R.306–07 (local resident stating that she lacks service in area); R.860–62 (local residents testifying about lack of wireless coverage in area); Tr. 66, 79–81, 84 (same)). Without a new telecommunications tower, Verizon services will remain unreliable for civilian users and for emergency responders. SPF ¶ 10 (R.85).

The record also establishes that the proposed tower would improve coverage and serve the public interest. SPF ¶ 20 (R.74). It will provide additional wireless communication services to an area that currently features minimal or inconsistent coverage. *Id.* These services will benefit residents, workers, visitors, and emergency responders. SPF ¶ 20 (R.74; *see also* R.77). Besides the services which will be provided by Verizon, the tower is designed to accommodate, by collocation, at least three additional wireless carriers. SPF ¶ 23 (R.74). The proposed tower will not result in any public cost. SPF ¶ 24 (R.74). In fact, the wireless communication services offered by Verizon are desired by both businesses and individuals and will be an economic asset to the community. SPF ¶ 25 (R.74). The tower's location was carefully chosen with the property owner to best conform with the current and potential future use(s) of the underlying property and to maximize the distance to the surrounding properties and uses. SPF ¶ 26 (R.79). The tower will be obscured from surrounding vehicular, pedestrian, and residential view sheds by the natural topography and existing tree cover on the subject parcel and throughout the surrounding area. SPF ¶ 27 (R.79).

*Second*, a preliminary injunction would serve the public interest by mitigating public safety risk. The Telecommunications Act itself exists to "make available, so far as possible, to all people of the Unites States, without discrimination . . . a rapid, efficient, nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of national defense, [and] *for the purpose of promoting safety of life and property* through the use of wire and radio communications." 47 U.S.C. § 151 (emphasis added). A robust, functioning wireless network is indispensable for ensuring quick, effective emergency response. *See, e.g.*, *Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 546 (S.D.N.Y. 2009) ("Given that many emergency first responder organizations rely upon wireless communications, any gaps in service also pose a public safety risk.").

In Bayfield County, cellular connectivity is critically important for "emergency respon[ders]." Bayfield Cnty., Wis., Comp. Plan, *supra*, at 6-11; Town of Russell Res., *supra*. Yet the existing gap in coverage currently poses a public safety risk. The Bayfield County Highway Department, for example, relies on Verizon for wireless service. SPF ¶ 11 (R.341). The Department, the Highway Commissioner explained, "has struggled with service in parts of the county for years," including in the area of the proposed tower. *Id.* (R.322; *see id.* at R.323 (calling the area a "dead zone")). Indeed, "highway crews regularly operate in isolated areas with limited or no cell coverage, which significantly impacts both worker safety and our ability to respond efficiently to emergencies and perform routine maintenance." *Id.* (R.323). And there have been specific instances in which the lack of coverage "delayed emergency response." *Id.*

(R.323). The proposed tower "absolutely will" "improve public safety" and "greatly enhance [the] department's operational communication during both emergency incidents and day-to-day maintenance work." SPF ¶ 21 (R.323, 341–42).

Nearby residents also explained that the lack of service in the area creates a public safety risk, because individuals injured in farming or motor-vehicle accidents—including in "treacherous" winter conditions—are unable to call for help. SPF ¶ 12 (R.304, 306, 861–62; *see* Tr. 79–81, 84). Multiple members of the Planning and Zoning Committee agreed that the proposed tower is needed to address public safety concerns. SPF ¶ 22 (*see* R.917–18, 928). Yet as long as TowerNorth is unable to install the proposed tower, Verizon will not have the requisite equipment in place for robust network to support emergency personnel and the public safety. SPF ¶ 13 (R.74, 77, 85, 89).

*Third* and finally, the policies underlying the Telecommunications Act and the Wisconsin Mobile Tower Siting Law show that a preliminary injunction would serve the public interest. When a legislature "indicate[s] its purpose" either in statutory language or legislative history, that is "itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief." *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 551–52 (1937) (quoted approvingly in *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 784 (7th Cir. 2019)).

In "an unusually important legislative enactment," *Reno v. ACLU*, 521 U.S. 844, 857 (1997), Congress enacted the Telecommunications Act to "encourage the rapid deployment of new telecommunications technologies," *Primeco*, 242 F. Supp. 2d

56

at 574 (quoting Preamble, P.L. 104-104, 100 Stat. 56), and to "expand the availability of wireless telecommunications services," *Nextel Commc'ns of Mid-Atl., Inc. v. City of Cambridge*, 246 F. Supp. 2d 118, 122 (D. Mass. 2003); *see also* 47 U.S.C. § 151; FCC Order ¶¶ 14–22. "One of the means by which it sought to accomplish these goals was reduction of the impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers." *City of Rancho Palos Verdes*, 544 U.S. at 115; *see also T-Mobile Cent., LLC v. Unified Gov't of Wyandotte Cnty.*, 546 F.3d 1299, 1306 (10th Cir. 2008) ("Congress adopted the TCA in order to promote competition and higher quality in telecommunications services and to encourage the rapid deployment of new telecommunications technologies. The TCA furthered these goals by reducing the impediments that local governments could impose to defeat or delay the installation of wireless communications facilities such as cell phone towers, and by protecting against irrational or substanceless decisions by local authorities." (citation modified)). "The legislative history evidences clear congressional intent to take 'down the barriers' to telecommunications." *Primeco*, 242 F. Supp. 2d at 574 (quoting *Sprint Spectrum L.P. v. Town of Easton*, 982 F. Supp. 47, 50 (D. Mass. 1997)); *see* H.R. Conf. Rep. No. 104–458, 104th Cong., 2d Sess. 113 (1996), 1996 U.S.C.C.A.N. 10, 124.

Moreover, Congress and the FCC have set forth a clear expectation that both local governments and courts decide disputes expeditiously. The Act directs local governments to decide applications within a reasonable time, 47 U.S.C. § 337(c)(7)(B)(ii), which FCC rules define as 150 days or fewer, 47 C.F.R. § 1.6003(c)(iv). Congress

further provided that "court[s] shall hear and decide [actions under the Act] on an expedited basis." 47 U.S.C. § 332(c)(7)(B)(v).

Animated by similar policy concerns as Congress, the Wisconsin Legislature also enacted the Mobile Tower Siting Law. Wis. Stat. § 66.0404; *see Town of Fond du Lac*, 2025 WI App 21, ¶¶ 35–36; *Savich*, 2024 WI App 43, ¶ 43. The state Siting Law, for its part, mandates a *shorter* shot clock—90 days—and directs a consequence for a political subdivision's violation—automatic approval. Wis. Stat. § 66.0404(2)(d); *Town of Fond du Lac*, 2025 WI App 21, ¶¶ 46–47, 50. The express purpose of Bayfield County's local law, too, is in accord. *See* Bayfield Cnty., Wis., Code § 13-1-43(a)(2) (purpose statement: "Maintain and ensure that a non-discriminatory, competitive and broad range of mobile services and high quality mobile service infrastructure consistent with the Federal Telecommunications Act of 1996 and provided to serve the community, as well as serve as an important and effective part of Bayfield County's police, fire, and emergency response network.").

Here, prompt relief would further federal, state, and local policy goals *and* best remedy the particular unlawful conduct at issue. The defendants violated federal and state law by taking too long to act on TowerNorth's application. Wisconsin law, in particular, says what happens next: automatic approval by operation law. For violations of the kind here, prompt injunctive relief is particularly appropriate and necessary to vindicate the purpose—and the textual commands—of the relevant laws.

In sum, failure to enjoin the defendants—and to enjoin them *now*—would undermine federal, state, and local policy, as expressed in law. Indeed, "allowing the

58

denial to stand"—even temporarily—"would be inconsistent with the policies underlying the 1996 Act—i.e., insuring the speedy deployment of wireless services to the public which undoubtedly benefits from such technology." *Mills*, 65 F. Supp. 2d at 160–61; FCC Order ¶¶ 120, 123.

## CONCLUSION

The Court should grant TowerNorth's motion; declare TowerNorth's application "deemed approved"; and issue an order either (a) enjoining the defendants from interfering with TowerNorth's "entitle[ment] to proceed with the activity for which it sought approval in its application," *Town of Fond du Lac*, 2025 WI App 21, ¶¶ 46–47, 50, (b) enjoining the defendants to issue all necessary permits to allow TowerNorth to proceed with construction of the proposed tower, or (c) both.

Dated: November 24, 2025

/s/ Joseph S. Diedrich
Joseph S. Diedrich
Rodney W. Carter
HUSCH BLACKWELL LLP
511 N. Broadway, Suite 1100
Milwaukee, WI 53202
414.978.5425

*Counsel to Plaintiff*