## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

TOWERNORTH DEVELOPMENT, LLC,

        Plaintiff,

v.

BAYFIELD COUNTY; and
BAYFIELD COUNTY BOARD OF
ADJUSTMENT,

        Defendants.

Case No.: 3:25-cv-964

## STATEMENT OF PROPOSED FACTS
## IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1.  TowerNorth Development, LLC, is a Delaware limited liability company authorized to do business in the State of Wisconsin, with a business address of 2400 Ansys Drive, Suite 102, Canonsburg, PA 15317. Declaration of Bert Stern ¶ 3.

2.  Defendant Bayfield County is a county existing under the laws of the State of Wisconsin. Its address is 117 E 5th Street, P.O. Box 878, Washburn, WI 54891.

3.  Defendant Bayfield County Board of Adjustment is a part of Bayfield County and is a county board of adjustment existing under the laws of the State of Wisconsin and is. Its address is 117 E 5th Street, P.O. Box 878, Washburn, WI 54891.

4.  This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because it concerns federal questions arising under the Telecommunications Act, 47 U.S.C. § 151 et seq., and specifically 47 U.S.C. § 332(c)(7)(B)(v).

5.  This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367 because those claims are part of the same case or controversy as the federal questions before the Court.

6.  This Court has personal jurisdiction over Defendants because they are governmental bodies located in the State of Wisconsin.

7.  Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in Bayfield County, Wisconsin, which is located in this judicial district.

8. Verizon Wireless provides wireless service in Bayfield County. Verizon has been experiencing a significant service gap in its network in and around the Town of Russell. Declaration of Joseph S. Diedrich, Exhibit 2, R.85.[1]

9. Verizon customers using their devices in the gap area are likely to experience diminished call quality, slow and unreliable data transmission speeds, call drops, and blocked calls. *Id.*; *see also* R.322–23, 341–42 (Bayfield County Highway Commissioner stating that wireless service is inadequate in area); R.306–07 (local resident stating that she lacks service in area); R.860–62 (local residents testifying about lack of wireless coverage in area); Diedrich Decl. Ex. 3 (Tr.) 66, 79–81, 84 (same).[2]

10. Without a new telecommunications tower, Verizon services will remain unreliable for civilian users and emergency responders. R.85.

11. The Bayfield County Highway Department relies on Verizon for wireless service. R.341. As the Highway Commissioner explained, the Department "has struggled with service in parts of the county for years," including in the area of the proposed tower. R.322; *see id.* at R.323 (calling the area a "dead zone"). Indeed, "highway crews regularly operate in isolated areas with limited or no cell coverage, which significantly impacts both worker safety and our ability to respond efficiently to

---

[1] "R." citations are to the administrative record, filed as an exhibit to the Diedrich Declaration.

[2] "Tr." citations are to the transcript of the Board of Adjustment hearing, filed as an exhibit to the Diedrich Declaration. This transcript is considered part of the administrative record.

emergencies and perform routine maintenance." R.323. And there have been specific instances in which the lack of coverage "delayed emergency response." *Id.*

12.     Nearby residents also explained that the lack of service in the area creates a public safety risk, because individuals injured in farming or motor-vehicle accidents—including in "treacherous" winter conditions—are unable to call for help. R.304, 306, 861–62; *see* Tr. 79–81, 84.

13.     Yet as long as TowerNorth is unable to install the proposed tower, Verizon will not have the requisite equipment in place for robust network to support emergency personnel and the public safety. R.74, 77, 85, 89.

14.     To address its service gap, Verizon identified a search area in which a new telecommunications tower needs to be located. R.85–86.

15.     The boundaries of the search area represent the outer limit of where a new tower could be constructed and still be effective. R.84–86, 89–91.

16.     After careful investigation, Verizon identified no existing towers within the search area on which Verizon could collocate its equipment (i.e., share space on an existing tower). R.73–74, 83, 86–87. The closest existing towers—including some closer to the lakeshore and at least one on Madeline Island itself—were outside the search area. *Id.*

17.     As a result, Verizon hired TowerNorth to identify a property within the search area that could accommodate a new telecommunications tower. R.72, 86–87; *see* Tr. 51–52, 65.

18.     Working together, Verizon and TowerNorth identified a parcel of private property in the Town of Russell, on which TowerNorth proposes to construct a tower for Verizon to locate its antennas and equipment. R.72–73, 86–87; *see* R.852–59 (testimony about site-selection process).

19.     TowerNorth and the property owner entered into a lease agreement. R.92–102.

20.     The proposed tower will provide a great benefit to the community. R.74. It will provide additional wireless communication services to an area that currently struggles with minimal or inconsistent coverage. *Id.* These services will benefit residents, workers, visitors, and emergency responders. *Id.*; *see also* R.77.

21.     The Highway Commissioner confirmed that the proposed tower "absolutely will" "improve public safety" and "greatly enhance [the highway] department's operational communication during both emergency incidents and day-to-day maintenance work." R.323, 341–42.

22.     Multiple members of the Planning and Zoning Committee agreed that the proposed tower is needed to address public safety concerns. *See* R.917–18, 928.

23.     Besides the services that will be provided by Verizon, the proposed tower is designed to accommodate, by collocation, at least three additional wireless carriers. R.74.

24.     The tower will not require any public participation or result in any public cost. *Id.*

25. In fact, the wireless communication services offered by Verizon are desired by both businesses and individuals and will be an economic asset to the community. *Id.*

26. The tower's location was carefully chosen with the property owner to best conform with the current and potential future use(s) of the underlying property and to maximize the distance to the surrounding properties and uses. R.79.

27. The tower will be obscured from surrounding vehicular, pedestrian, and residential viewsheds by the natural topography and existing tree cover on the subject parcel and throughout the surrounding area. *Id.*

28. TowerNorth operates in a highly competitive industry that seeks both to provide infrastructure-deployment services to carriers like Verizon and, ultimately, to provide adequate wireless service to consumers and emergency personnel. Stern Decl. ¶ 4.

29. The delay and the denial at issue here will cause TowerNorth to lose business opportunities to other infrastructure developers. *Id.* ¶ 5.

30. It will also cause TowerNorth's customer, Verizon, to likely suffer a loss of existing customers and the inability to attract new customers. *Id.* ¶ 6.

31. This likely loss of business would be difficult, if not impossible, to quantify in monetary terms. *Id.* ¶ 7.

32. The delay and the denial at issue here will also likely cause Tower-North and its customer, Verizon, to suffer a loss of good will and damage to their reputations. *Id.* ¶ 8.

33.     Assigning a monetary value to this reputational harm would be difficult, if not impossible. *Id.* ¶ 9.

34.     The proposed tower, once built, can be completely removed. R.849. If it is later determined on final judgment or appeal that a denial was lawful, TowerNorth can remove the tower and restore the land to its prior state. *Id.*

35.     On May 20, 2025, TowerNorth, through its agent Terra Consulting, submitted an application for a CUP to site and construct a new telecommunications tower in the Town of Russell in Bayfield County. *See* R.63–206.

36.     The application included, among other things:

- An extended narrative description of the proposed tower and its compliance with federal, state, and local regulations. *See* R.72–79.

- An affidavit of a radiofrequency (RF) engineer, declaring that there are existing structures that provide a feasible collocation opportunity. R.83–84.

- A letter from an RF engineer, explaining the technological need for the new tower, R.85–87, and accompanying maps, R.88–91.

- FCC licenses for the proposed site. R.103–16.

- An FCC antenna registration. R.117–18.

- A NEPA environmental review, with a finding of no significant impact from the proposed tower. R.119–30; *see also* R.463–759.

- An FAA determination of no hazard to air navigation from the proposed tower. R.131–39.

- An engineering certification. R.140–41.

- A certificate of liability insurance. R.142.

- A site plan. R.158–204.

37. Bayfield County received TowerNorth's CUP application on May 20, 2025. R.63.

38. On May 30, Bayfield County requested additional information from TowerNorth. R.210.

39. On June 17, TowerNorth provided the requested information. R.207–14. The period of time between when Bayfield County notified TowerNorth that additional information was needed and when TowerNorth provided that information was 18 days. R.207–11.

40. TowerNorth's application was "deemed complete" by Bayfield County on June 20. R.207.

41. TowerNorth later supplemented its application with a certified appraisal showing that the tower "will not measurably impact the value of surrounding properties." R.760–825.

42. On July 21, 2025, the Planning and Zoning Committee held a public hearing on TowerNorth's CUP application. *See* R.833–931. Before the hearing, a petition was submitted showing that at least 69 nearby residents supported the tower. *See* R.399–407.

43. At that meeting, the Committee voted to approve TowerNorth's application. R.834–37.

44. On July 31, the Committee issued a written decision documenting its approval. R.826–32. The Committee found, among other things, that:

- The proposed tower complies with applicable law.

- The proposed tower is consistent with the Bayfield County Comprehensive Plan.

- "[A]dditional cellular service in an area that does not have any service would seem to increase the safety and provide better access to emergency services."

- Evidence showed there is "a dead zone with no cellular coverage," and that the tower "will expand coverage where there is presently none," thereby "provid[ing] individuals access to emergency services."

- "The neighboring properties are predominantly used for farming and residential use[,]" and "there does not appear to be any evidence that they will not be able to carry out any activity as a result of this tower."

R.826–27.

45. On August 19, 2025, an appeal of the Planning and Zoning Committee's decision was filed with the Board of Adjustment by "Citizens for Land Use Transparency and Integrity" ("by Esme Martinson"). R.6–58.

46. Among other things, the Citizens disputed the need for the tower and contended that it would diminish their property values. *See* R.9–12.

47. The appellant before the Board of Adjustment agreed, referring to "the Board of Adjustment *of the County*" and admitting that the Board of Adjustment is "*part of the County*." R.1080 (emphases added).

48. On multiple occasions, TowerNorth warned Bayfield County and its Board of Adjustment about the federal and state shot clocks, urging prompt action and preserving its argument that the shot clock had expired. *See* R.1121–25, 1099–1120, 1096–97, 1077.

49.     On October 30, 2025, the Board of Adjustment held a public hearing and conducted de novo review of the Planning and Zoning Committee's decision. R.1, 3–4, 1094. *See generally* Tr.

50.     At that hearing, the Board voted to deny TowerNorth's CUP application. Tr. 106–07.

51.     The Board of Adjustment's oral decision at the hearing came: 163 days after TowerNorth filed its application, 132 days after Bayfield County deemed Tower-North's application complete, and 72 days after the appeal was filed with the Board of Adjustment.

52.     On November 19, 2025, the Board of Adjustment issued a written decision documenting the denial. Diedrich Decl. ¶ 5, Exhibit 4.

53.     The decision was transmitted on Bayfield County letterhead, signed by the County Planning and Zoning Director. Diedrich Decl. Ex. 4 at 1.

54.     The Board of Adjustment's written decision at the hearing came: 183 days after TowerNorth filed its application, 152 days after Bayfield County deemed TowerNorth's application complete, and 92 days after the appeal was filed with the Board of Adjustment.

55.     Besides background facts, the Board of Adjustment's decision in its entirety provides the following reasons for the denial:

> That on October 30, 2025 the Board held a De Novo Review Hearing of the Committee's granting of Tower North's CUP, and made the following determinations after review of substantial evidence:
>
> a. The application or use proposed by Tower North is incompatible with the rural character and fails to preserve and protect the natural beauty

and dark skies of the area, including the Apostle Islands National Lakeshore.

b. The application or use proposed by Tower North would have a negative impact on the Town of Russell's economy, including but not limited to tourism and the local tax base, and would reduce property values of the real estate in the vicinity of the proposed cellular communication tower.

c. The application or use proposed by Tower North is inconsistent with the Town of Russell's and Bayfield County's comprehensive plans.

Diedrich Decl. Ex. 4 at 3–4.

56. During the Board of Adjustment oral hearing, the only mention of an issue about alleged negative effect on the economy was by Esme Martinson. She stated that "[a] 299-foot lattice-style tower placed in a scenic or residential area stands in stark contrast to the County's stated goals of preserving its rustic environment and protecting its tourism-based economy." Tr. 31.

57. TowerNorth's appraisal used a recognized appraisal technique—a "paired sales analysis of single-family homes located near cell towers in the local area"—to reach a conclusion about the value of property actually *in the vicinity of* the proposed tower. R.770, 805; *see* R.781–805.

58. The Citizens submitted a "letter report" from Real Estate Dynamics. R.1126–31. That report mentions a series of academic articles about property values in faraway places like New Zealand, South Africa, and Florida. R.1127–29. The report's authors admit that they "have not valued the Pearson property [at issue]." R.1129. The report does not conduct any comparable-sales analysis or perform any valuation based on recognized appraisal techniques—much less a valuation specific

to Bayfield County or northwestern Wisconsin. R.1126–31. Instead, the report "hypothesize[s]" and "suspect[s]" things. R.1128–29.

Dated: November 24, 2025

/s/ Joseph S. Diedrich
Joseph S. Diedrich
Rodney W. Carter
HUSCH BLACKWELL LLP
511 N. Broadway, Suite 1100
Milwaukee, WI 53202
414.978.5425

*Counsel to Plaintiff*